STATE OF IOWA v. JOHN NOLAN, Appellant.

**Murder: Evidence of Premeditation.** Sometime before the killing, deceased discharged defendant. The latter had struck him in "rough sport," and had insulted his wife. After the discharge he made threats. He was again employed, and when deceased went away from home for a week he left his family with defendant. During this absence defendant attempted liberties with the wife. After deceased returned he went driving with defendant. Both were drunk and deceased received the injuries from which he died, during that drive. *Held*, there was not sufficient evidence of premeditation to sustain a verdict of murder in the first degree.

**Instructions.** It is not proper. to charge that habitual drunkenness and alcoholism do not affect the credibility of a witness and bear simply on the probability of his remembering correctly.

*Appeal from Marshall District Court.*—HON. N. B. HYATT, Judge.

WEDNESDAY, DECEMBER 12, 1894.

THE defendant was convicted of the crime of murder in the first degree, and was adjudged. to be imprisoned in the penitentiary at Ft. Madison, at hard labor, for the term of his natural life. From that judgment he appeals.—*Reversed.*

*James Allison* and *O. Caswell* for appellant.

*John Y. Stone*, attorney general, *Thos. A. Cheshire*, and *J. L. Carney* for the state.

ROBINSON, J.—On the fifth day of October, 1892, one J. B. Hurto received injuries which caused his death a few days later. At that time the defendant was working for him as a farm laborer. At about 10 o'clock in the morning of the day named, Hurto returned from an absence of about ten days in the states of Missouri and Nebraska, and was accompanied

by a neighbor named Janes, who had been with him
on the trip. Both were somewhat under the influence
of intoxicating liquor. Soon after their arrival, the
defendant, Nolan, came to the house from a field,
where he had been at work, and drank whisky or
brandy which was given him by Hurto and Janes.
The three men drank together several times, and after
a time Nolan was told to harness a team to take Janes
to his home, which was something more than two miles
distant. Hurto finally concluded to go with them,
and the three started away together in a light wagon
or buggy. All occupied one seat, Nolan driving.
They took Janes home, all continuing to drink the
liquor. After they had finished it, Hurto and Nolan
left for their home, the latter driving, and both being
somewhat intoxicated. Hurto is described as being
"pretty noisy" at the time. The road they took to
reach home led eastward from Janes' nearly three
fourths of a mile, thence northward three fourths of a
mile to Goodwin's corner, thence westward the same
distance to a schoolhouse, thence northward about one
fourth of a mile to Hurto's house. At about 2 o'clock
in the afternoon Nolan reached home, but without
Hurto. In reply to a question of Mrs. Hurto, he said
her husband was "down here a little way, laying on
the road;" that he was not hurt; that the team ran
away, the wagon was upset, the horses became
detached from it, and that defendant had all he could
do to hold them. She told him to go back and get
Hurto, but he objected that he could not get Hurto
into the wagon, and said, "Let the drunken fool lay
there." She then told the defendant to go to a neigh-
bor's for help, and to bring Hurto home. The defend-
ant drove away, and appeared at Janes' house at about
3 o'clock, and told him that the wagon had been upset,
that Hurto had been thrown out and hurt, and that
Nolan wanted Janes to help place Hurto in the wagon.

The two men started for Hurto, but Janes says he understood Nolan to say that the accident occurred on the road south of Goodwin's, and that they did not go west of Goodwin's, and did not find Hurto. Janes went home afoot, and Nolan drove into a road which led from the road south of Goodwin's to a place called "Rhodes." There he purchased a quantity of cider, and returned to Janes' house, reaching there after 5 o'clock, and reporting that he had not found Hurto. Janes then went with him, and they found Hurto lying on the side of the road, west of Goodwin's, placed him in the wagon, carried him home, and placed him in the barn. At nearly 10 o'clock at night they went for a physician, about ten miles away. At midnight the physician arrived, and caused Hurto to be carried to the house, and examined him. He found bruises on his face, head, and body, that his spinal column was fractured, that his lower limbs were paralyzed, and that he was without sensation in his hands and arms. Some of the bruises might have been made with a man's boot. It is claimed by the state that defendant pounded Hurto, threw him from the wagon against a fence post, and kicked him, thereby inflicting the injuries which caused his death. It is the theory of the defense that the team became unmanageable by reason of the acts of Hurto while intoxicated; that it ran away, became detached from the wagon, which was overturned, and that both were thrown out, and that in that manner Hurto received the injuries in question.

I. The court charged the jury as follows: "Drunkenness does not disqualify a witness from testifying in court, provided he be sober at the time of testifying; but if he give evidence concerning an event at the time of the occurrence of which he was intoxicated, or under the influence of intoxicating liquors, such intoxication or degree of intoxication should be considered by you as a circumstance not

affecting his credibility, but the probability of his correctly remembering what transpired while so intoxicated. And if in this case you find from the evidence that the deceased, James B. Hurto, was intoxicated at the time he received his injuries, or was to a considerable extent under the influence of intoxicating liquors, you will consider such fact, and its effect, if any, upon the probability of his correctly recollecting the events. of which he spoke, and which have been introduced here as dying declarations, if you find that he did make such declarations." The appellant complains of the words "not affecting his credibility," as used in the following portion of the charge: "Such intoxication or degree of intoxication should be considered by you as a circumstance not affecting his credibility, but of his correctly remembering what transpired while so intoxicated." It is said that Hurto had been a drunkard for years, and was affected with chronic alcoholism, mental symptoms of which are the impairment of the intellect, the loss of memory, the loss of the sense of right and justice, and actual aberration of mind. That chronic alcoholism may produce such results, and others of a similar character, is shown by the authorities, and it follows that the credibility of a witness may be thereby affected. It is said the words in question were used in a moral sense, but we think the credibility of the witness was a fact for the jury to determine, and that they were entitled to weigh his evidence in view of all the facts disclosed by the record. The evidence tends to show that Hurto was an habitual drunkard. His declarations made after receiving the injury were of vital importance to the state to convict the defendant, and it is not probable that he would have been convicted of the crime of murder in the first degree had the declarations not been received. Some of them are claimed by the defendant to have been unreasonable and contrary to uncontra-

dicted facts. It may be the jury would have found the claims thus made to be unfounded, and that the credibility of Hurto had not been affected by his habits, and it is possible that the words complained of could not have been prejudicial in view of the charge as an entirety; but their use was erroneous, and should be avoided on another trial.

II. The only other question we find it necessary to determine is whether the verdict is sustained by the evidence. We are of the opinion that it must be answered in the negative. There was evidence which tended to show that the injuries which caused the death of Hurto were inflicted by the defendant willfully. Hurto stated repeatedly, when he believed death to be imminent, that the defendant pounded him, kicked him, and threw him against a stub and a post. When the defendant and Hurto left Janes' house to return to their own, the defendant was driving. He claims that Hurto was quite drunk, and soon took the reins, but when they approached the first corner, at which there was an abrupt turn to the north, the defendant took the reins; that Hurto obtained possession of them again near Goodwin's corner; that he cautioned Hurto to be careful—that the horses were feeling well and inclined to go fast—but that when near a culvert west of Goodwin's, which was out of repairs, Hurto said to "let them run," and slackened the reins, and the horses did run; that they did not go in the traveled track, which went around the culvert; that at the culvert the defendant tried to catch the reins, but failed to do so, because Hurto held them so that he could not reach them; that he got down with one hand on the bottom of the wagon, and the other on the dashboard to catch the reins; that the horses turned one wheel into a hole, the tongue dropped, the wagon tipped over, and Hurto was thrown out, and thus received the injuries which caused his death; that

defendant caught the reins as he was going out, and stopped the horses; that he tried to put Hurto into the wagon, but could not do so, and then drove home.

No one but these two men appear to have seen the accident, but there is testimony, in regard to tracks in the road, and the condition of the horses, and other matters, which tends to discredit the statements of the defendant. As our disposition of the case will probably lead to another trial, we refrain from commenting on this testimony at length. To show premeditation, the state relies on certain events which occurred before the time the injuries in question were received. It appears that the defendant was employed by Hurto in the summer of the year 1892 to work on his farm. Mrs. Hurto testifies that on one occasion during that time the defendant struck her husband, and knocked him senseless; that at one time he and two other men insulted her, and that while her husband was away in Missouri and Nebraska, just before his death, the defendant carried her forcibly into a bedroom, and attempted to take liberties with her; that just before Hurto, the defendant, and Janes started for the home of the latter, on the day Hurto was injured, the defendant "swore at Hurto, and said he heard he was going to discharge him;" that when he returned from Janes' house, without her husband, the defendant said that Hurto "ought to be dead," and that she "ought to have her neck broke, too;" and, when she asked him what good that would do, he said, "It will do me some good some day." Other witnesses testify to threats made by the defendant against Hurto. The evidence, however, satisfies us that the striking of Hurto by the defendant was not with the intent to do any harm, but was in the nature of rough sport, and that Hurto so regarded it. It is true that the defendant was discharged a short time afterward, and that while he was away he may have said: "There goes J.

B.   I will get even with the son of a bitch, if I have to kill him"—or something of that nature.   It is also true that when intoxicated he may have said:   "Damn Hurto.   I would do him up if I went home with him." But those expressions of ill will appear to have been due to his discharge, for which he especially blamed Mrs. Hurto.   After a time he was re-employed by Hurto, although the latter had been told of the alleged insult, and the two men appear to have been good friends after that time.   When Hurto, in the latter part of September, started on his trip to Missouri and Nebraska, he left his wife and three children, the oldest of whom was but six years of age, alone with the defendant.   The attempt made during Hurto's absence to take liberties with Mrs. Hurto was resisted by her, and was not again made.   On the morning of his return, Hurto greeted the defendant kindly.   When the latter spoke of being discharged, Hurto replied that he had not said anything about discharging him, and when the three started away from the house no ill will appears to have been shown by any one, and none is shown by the testimony of Janes.   When the defendant and Hurto left Janes' house, both were intoxicated. On the road leading north toward Goodwin's they were seen by a witness who stated that Nolan was driving; that the horses were going rapidly, trotting at first, and then running; and that he saw Nolan slap them with the reins.   What occurred after the team turned westward at Goodwin's corner is known only to the defendant.   He is said to have stated to a witness that the team tried to run away; that he tried to get the reins and Hurto would not let him have them, and that they then had a "fracas;" and it is possible, if not probable, that they did have a quarrel, in which the defendant inflicted the injuries in question.   If they did, it is not shown that it was premeditated by the defendant. His conduct toward Hurto after the injuries, although

apparently brutal, may have been due in part to his own condition, and to the belief that Hurto was not hurt, but was only intoxicated. Janes appears to have shared that belief, and Hurto was taken to the barn because it was his custom, when intoxicated, to go there. The evidence tends to show that the defendant was profane, coarse, and brutal, and that he became drunk frequently; but we are of the opinion that it fails to show the premeditation necessary to constitute the crime of murder in the first degree. The judgment of the district court is REVERSED.