STATE OF IOWA, Appellee, v. JAMES SALING, Appellant.

CRIMINAL LAW: New Trial—Passion and Prejudice—Affidavit—
1 Effect. An affidavit, in support of allegations in a motion for a new trial, that the verdict is the result of passion and prejudice, is futile, and unknown to our practice.

CRIMINAL LAW: Appeal—Absence of Objections—Effect. Defend-
2 ant in a criminal case has no right, in the trial of the case, to allow matters and things to occur without objection or exception of any kind, and then, on appeal, predicate error thereon and demand reversal. Defendant is not above complying with the rules of the court, even though Section 5462, Code, 1897, does command the appellate court to review the cause without regard to technical defects. So *held* where instructions were not excepted to, and where evidence was received without objection.

CRIMINAL LAW: Appeal—When Verdict Not Conclusive. Criminal
3 causes on appeal will neither be tried *de novo* nor will a verdict be allowed to stand which is against the *clear* weight of the evidence.

CONSPIRACY: Evidence—Sufficiency. Evidence reviewed, and
4 held that the overt acts relied on by the State were insufficient to sustain a verdict of guilt of conspiracy to burn property with intent to injure insurers.

CRIMINAL LAW: Motive—Failure of Proof—Effect. Principle rec-
5 ognized that proof of a motive is not necessarily essential to a valid verdict of guilt.

CRIMINAL LAW: Verdict—Verdict on Suspicion. Principle recog-
6 nized that evidence which gives rise to only a suspicion of guilt will not sustain a verdict.

CRIMINAL LAW:  Verdict—Sufficiency of Evidence—Fact Holding
7  in Appeal of Codefendant—Effect.  A ruling, on an appeal by one
   defendant, that the evidence is sufficient to sustain a conviction,
   does not rule the court on another and subsequent appeal by an-
   other defendant in the same indictment, unless *at least* both records
   are before the court and are, in effect, the same.

*Appeal from Union District Court.*—H. K. EVANS, Judge.

WEDNESDAY, SEPTEMBER 27, 1916.

CONVICTION on charge of conspiracy to commit arson.
Defendant, Saling, appeals.—*Reversed.*

*Temple & Temple* and *S. R. Allen,* for appellant.

*George Cosson,* Attorney General, and *John Fletcher,*
Assistant Attorney General, for appellee.

SALINGER, J.—I.  It is in dispute whether one Tracy, an
assistant to the fire marshal, used color of his office to induce
or compel defendant to make statements to him tending to
connect defendant with the fire at Cromwell.  Tracy was
before the grand jury, and, so far as appears, as a witness.
This does not base a complaint that the court erred in refus-
ing to set aside the indictment.

II.   To support an allegation, in motion for a new trial,
that the verdict is the result of passion and prejudice, affidavit
was made which is, in effect, an argument why the verdict
should be held to have been so induced.  The
following are items:  (1) The verdict is due

1. CRIMINAL LAW:
   new trial: pas-
   sion and preju-
   dice: affidavit:
   effect.

to passion and prejudice because defendant,
under advice of counsel, did not become a
witness, which fact unjustly created a prejudice in the minds
of the jury; (2) circumstances relied upon by the State to
establish guilt were not convincing, and failed to convince
the audience outside of the jury box, but, upon the other hand,
convinced the public generally that defendant was innocent
of the crime charged, as he is informed and verily believes,—

wherefore, he feels justified in averring that the jury must have been influenced by passion and prejudice; (3) defendant's counsel were compelled, in order to preserve the question of law as to the admissibility of certain evidence concerning the Cromwell fire, to make a great many objections to evidence, which were all overruled, which caused the jury to believe that defendant was relying on a purely technical defense; (4) affiant avers under oath that in fact he is entirely innocent of the crime charged, and that he, therefore, believes the jury must have been influenced by passion and prejudice. A sworn argument is no aid to such an averment in motion for a new trial. Such an argument as this is ineffective, anywhere.

III. Appellant takes the view that, by reason of the provisions of Code § 5462, it becomes immaterial what record appellant makes below. For illustration, that we should reverse for giving instructions, though they were not excepted to; reverse for receiving testimony or failure to withdraw issues when no objection was made. It has been held that a new trial may be granted in an extreme case where utter incompetency of counsel prevented the defendant from having a fair trial. We have here no such case. At most, the counsel who appeared for the defendant in the trial below, and who do not appear for him on this appeal, were perhaps not as diligent in making objections and the like as they might well have been. But there is nothing in this record to relieve the defendant from *respondeat superior,* and from being bound by the acts of his agent. There is something more than the defendant to consider. It would be subversive of all orderly procedure, and utterly unfair to trial courts, if they may be reversed for doing what was, in effect, stipulated might be done. Be that as it may, there is certainly nothing in said statute which excuses the counsel for appellant from presenting his case here as the rules require. We know of no reason why we should consider assignments without brief

2. CRIMINAL LAW: appeal: absence of objections: effect.

which declare that it was error to overrule motion in arrest
of judgment; that it was error to refuse defendant the right
to cross-examine the witness of the State, "as shown by the
record;" that the court erred "in admitting testimony over
objection of defendant, as shown by the record." The statute
does not demand of us that we dispense with salutary rules of
procedure where appellant is attempting to proceed under
them, nor that we shall substitute ourselves for trial counsel.
See *State v. O'Donnell*, 176 Iowa 337.

There are, however, assignments which, though not
strictly in conformity to rule, do sufficiently present whether
the verdict has sufficient support in evidence, or whether it
is the result of passion and prejudice, and
contrary to the evidence. The State asserts
that, as this is wholly a fact question, we can-
not pass upon it. The appellant is of opinion
that this has been the rule, but insists we should not follow it.
There are general words in some of our opinions that give
color to the contention of the State, and to the concession
of the defendant. But, after all, no generalizing will quite
meet all situations on appeal in criminal cases. We began
long ago to adhere to said general rule, and also to hold that,
notwithstanding it, we would interfere in criminal convic-
tions. We hold, in *State v. Olds*, 106 Iowa 110, that we will
not readily set aside the verdict in criminal cases. To be
sure, we say, in *State v. Falconer*, 70 Iowa 416, that the ver-
dict will not be interfered with when there is a clear conflict
in the evidence. But we have never departed from the rule
that we will, on appeal, interfere more readily in a criminal
case on the ground that the verdict is contrary to the weight
of the evidence. *State v. Tomlinson*, 11 Iowa 401. A verdict
will not be supported if it is against the clear weight of the
evidence. *State v. Pilkington*, 92 Iowa 92. Though proceed-
ing carefully and cautiously, such a verdict will not be sup-
ported. *State v. Reinheimer*, 109 Iowa 624. When a convic-
tion is clearly contrary to the weight of evidence, the Supreme

3. CRIMINAL LAW:
appeal: when
verdict not con-
clusive.

Court should set it aside on appeal. *State v. Woolsey*, 30 Iowa 251. In *State v. O'Donnell*, 176 Iowa 337, we reverse a conviction of murder in the first degree because we find the evidence insufficient to sustain a conviction in that degree. In *State v. Nolan*, 92 Iowa 491, approved in the *O'Donnell* case, we reverse because we find there was not sufficient evidence of premeditation to sustain a verdict of murder in the first degree. And see *State v. Teale*, 162 Iowa 451. It will no more do to make the verdict of a jury conclusive in a criminal conviction of a grave felony than it would do to try criminal cases *de novo*. That neither is permissible does not in the least affect either our duty or our power to interfere with the verdict of a jury in a case where such interference is proper.

IV. The appellant complains of the overruling of a motion to direct verdict at the close of the evidence for the State, and the State responds that that action was not erroneous. We are unable to find that a motion

**4. CONSPIRACY: evidence: sufficiency.** to direct was made at any time. But, as said, we do have the question whether this verdict has sufficient support in the evidence, or is the result of passion and prejudice. The essence of the charge as to which the proof is challenged is that defendant, Saling, and one Madden and one Emerson, feloniously conspired to burn a dwelling house and its contents belonging to Saling and situate in Creston, a dwelling house and contents belonging to Madden and situate in Cromwell, and a dwelling house in Corning with intent to burn its contents, which were the property of Emerson, and that the conspiracy was for the purpose of injuring certain insurers of said property. It is charged further that, as a result and consummation of said conspiracy, defendants did wilfully, etc., set fire to and burn all said dwelling houses and their contents, with the purpose and intent of injuring said insurers, contrary to and in violation of law.

The State relies upon the alleged overt acts for proof

of the alleged conspiracy. That is to say, it does not claim there is direct evidence of illegal confederation, but insists the conspiracy charged has enough evidence in support to sustain the verdict, because there is enough evidence to make it a fair jury question whether the defendants did or did not concertedly burn or attempt to burn said properties, with said intent. If there be no sufficient evidence that either of the three attempted to or did set fire to either of said items of property, then, on the trial theory of this case, there is not sufficient evidence that they conspired to do the charged burning. So, if the burning attempted or done is not sufficiently shown to have been on concerted action. The inquiry then resolves into: What is the proof that some of the three, or all three concertedly, attempted to burn, or did burn, either or all of said properties?

V. The record fairly tends to establish that Saling, a dealer in secondhand goods, sold to Madden a line of goods that could be used in household or hotel keeping, and that he made out a list and agreed on a price, with delivery made at Cromwell. Saling did not have all the goods desired, and, to complete delivery, obtained some in addition to those first listed. The goods were transported to Cromwell from Creston by drayloads. They were put into the building in Cromwell probably a week or ten days before August 1, 1911, when a fire in that building occurred.

There is evidence which, if believed, shows that, between seven and half past seven in the evening, about 11:30 of which the fire in Cromwell occurred, Madden hired a single horse and top buggy of a liveryman in Creston, and that this horse and buggy were returned by Saling, about half past eleven that same night. There is evidence which tends to discredit the testimony of the liveryman and his helper, some of bias, and there is direct impeachment of the helper. There was much to indicate that, if their story be true, two horses were hired by Madden on the day of the Cromwell fire,—a thing which no one claims was done; and there is a most

powerful alibi, which, if believed, utterly disproves that Saling ever returned any horse. It is, however, unnecessary for us to deal with the weight of testimony of the liveryman and his assistant, because it may be conceded, for the sake of argument, that the jury was warranted in believing them. Though believed, it proved no more than that Madden hired this rig about half past seven in the evening of the Cromwell fire, and that Saling returned it at about the time when the fire at Cromwell broke out. Unless, however, there be some evidence to connect the getting, using and returning of this rig with that fire, the fact that it was thus got and returned does nothing for the case of the State.

For a single horse, it is at least an hour's drive between Creston and Cromwell. One Randolph says that a horse was tied at the barn on the Madden property in Cromwell between 7 and 7:30; that he saw this when he went to business after supper; and that, if the buggy with it had a top, it was not up. Manifestly, this is not the rig that was hired in Creston between 7 and 7:30. Polson claims to have seen a horse and buggy in Cromwell, but really testifies to nothing of substance on the subject, even if there were not affirmative proof that what he saw could not have been the rig in question. He looked out of the window and saw a horse "down there on the corner;" says he could not tell at the time, "until they drove out, whether there was anyone in the buggy or not;" that, when the alarm of fire was given, "they turned and drove east pretty rapidly," whereupon he dressed and went to the fire. He guesses it was pretty dark that night, does not remember whether the moon was shining, and can't say whether or not it was cloudy. There were no street lights, and he was some forty feet from the horse when he saw it, on looking through the window. He says that he could not tell until they drove out whether there was anyone in the buggy; also that he didn't see any man; also, that there was a man in the buggy when it drove away, and he didn't recognize him. He can't tell the color of the horse nor say whether

it was large or small, or whether it was hitched to a top buggy or not. After having said the horse was tied to the barn, he says he doesn't know what it was tied to, doesn't think it was tied to anything and was just standing in the street; that he just saw a buggy standing there between him and the fire; that there were trees between him and the buggy and the fire, and he doesn't know whether there was a man or a woman in the buggy.

It is apparent that this, of itself, has no probative weight on the proposition that the rig hired in Creston was in Cromwell that night. But that is not all. Polson saw this after there was a fire, when the alarm of fire wakened him. The fire began at 11:30. That being so, the rig that Saling is said to have returned in Creston at 11:30 was not the one Polson saw, if he saw anything.

## 2.

Madden went to Creston on the afternoon of the day on the night of which the fire occurred. He went to get the woman who is now his wife, and in order to have her meet her sister, who had that afternoon come to Creston. He explains that the sister was intending to return on the 7:27 evening train, if Mrs. Madden did not come home, and that at that time he understood that Mrs. Madden and the little girl would stay at Cromwell. He concedes that Mrs. Madden could have got back on the evening train at very near the same time that they arrived by buggy, and that he could have telephoned her, but says that, if Mrs. Madden had come back on the train, the sister would have passed her on the way, and he told the sister he would go down and he thought they would be back at five. He stayed longer than he expected, because she had some things she wanted him to help fix up. When they reached Creston, it was right around seven, and the train from Cromwell would have brought her to Creston about 7:30. Concede, if you please, that this is not a very

satisfactory explanation. But, on the other hand, the fact that Madden brought the woman home that afternoon, or that he brought her by team when she might as well have come by train, seems to have no relevance to burning a building at Cromwell that night.

VI. It is doubtful whether the State claims that all foregoing sustains the conviction; and we think it does not sustain it. The argument that seems to be thought vital is the proposition that there was over-insurance. The State concedes too much. There can be no proof of over-insurance without proof of what the property insured was worth. As to this, the evidence concerning the value of the Madden property in Cromwell is so unsatisfactory as that it would be held insufficient in a civil case controlled by the value of property. It surely has no better standing when relied on as an important link in the chain of evidence in a felony trial; and, as to the value of the house in Cromwell and a conspiracy to burn it down to get the insurance, it appears that the insurance was not written for either of the defendants, but for one who formerly owned the house and kept the insurance alive to cover his mortgage interest created on sale, and that it is very doubtful whether defendants even knew there was such insurance. And it is not at all well proven that the property was not worth the amount it was insured for. As to the Saling house in Creston, the evidence is in like case. There is no evidence of over-insurance, and as to its contents, there is evidence how much they were insured for and none as to what they were worth.

However, it does not follow that the State has failed to make a case merely because there was no satisfactory evidence of over-insurance, and this is so though the State seems to rest its case upon the existence of over-insurance. If there was a confederation to burn these properties, there was an intent to defraud the insurer; for that is what was accomplished when the insurer must pay the one who committed arson the real

5. CRIMINAL LAW: motive: failure of proof: effect.

value of the property burned, when it has received nothing greater than the premium. The insurer is injured because a crime compels it to pay more than it has received, and because it would not have to pay at all, no matter how much had been received, had the crime not been committed. The most that failure to prove over-insurance does is failure to prove motive. While the absence of motive is a strong argument for the defense, there might be other circumstances proving guilt. It is not matter of law that a defendant has not committed a crime unless an adequate motive is fully proved. And it might be true that the property was worth all it was insured for, and yet it be so difficult to turn it into cash at its true value that a motive would exist, even though the policy was not for more than the reasonable market value of the insured property.

## 2.

The State suggests that the following circumstances connected with the transaction justly create suspicion that the Cromwell fire was an accomplishment of the charged conspiracy:

1. That the property was insured on July 14th and burned on August 1, 1911. But it will scarcely be claimed that this of itself even indicates a conspiracy to set the fire.

2. The hauling was done after dark. True. But the evidence for the State shows without conflict that this was done against the objection of Saling, and done because the drayman insisted upon it for his own convenience, and, for that reason, loaded up between 6 and 7 in the evening.

3. After the goods had been bargained and settled for, Saling made two trips with Madden to Cromwell, not on a load of furniture or to assist in transporting it, but in a buggy driven to the premises where the furniture was being delivered. But it is neither unusual nor remarkable that a seller

of secondhand goods being transported by dray to a town some distance away should go to the point of destination in a lighter vehicle than the drays which are carrying the loads. A natural desire to make sure of safe delivery and installation of the goods upon which one contemplates taking a mortgage for most of the purchase price will reasonably explain this, without the imputation of a conspiracy to commit arson.

4. It is claimed that the evidence shows that Saling never had made a practice during his business career to make deliveries as distant from his place of business as was the delivery in this case. The evidence is silent on this point; wherefore, it is not shown that this was an unusual practice.

5. It is pointed out that, while the testimony shows that Madden paid but $50 on the purchase price, Saling told the adjuster that $100 had been paid down, and a mortgage taken for the balance. The adjuster does not say positively that Saling said he had been paid $100 down, rather than $50, but thinks this was said. There is nothing in its character to impress it upon his memory and he does not speak on more than general understanding that he had, and does not profess to give even the substance of all that was said.

6. Nothing was said to the adjuster about anyone else's having an interest in the destroyed goods. Naturally enough, since no one but Madden and Saling did have any interest in the burned goods.

7. By some stretching, there is testimony that the woman who is now Mrs. Madden was, "prior to the fire," seen carrying an oil can from Reddick's store to the house that later was found on fire. The State claims that Madden and the woman made an explanation that the oil was used to clean the woman's dress, and points out that, when these two were witnesses, they gave no such explanation; also, that an explanation was made, and not repeated on the witness stand, that cleaning the woman's dress on the evening of the fire, before she left Cromwell to return to Creston, might have been the cause of the fire. The answer is that it nowhere appears in

this record that any such explanation was given. There is no mention of using oil to clean dresses, or of that's being the origin of the fire. Possibly the attorney general is confused on this by recollection of some item of evidence in the Madden appeal record.

But if, as the State claims, these do raise a mere suspicion that defendant is guilty, a verdict resting on mere suspicion is not well supported.

6. CRIMINAL LAW: verdict: verdict on suspicion. VII. About 13 months after the Cromwell fire, the dwelling house of Saling, in Creston, was discovered on fire in the night. To make this a suspicious fire, the State points out just this: Saling had gone to Nebraska a day or two before the fire; the house had to be broken into because no one was sleeping there; and it urges that the explanation for this is, in itself, suspicious, it being that defendant's son was sleeping in his secondhand store because he was so slow about getting up that, if Saling let him stay at home in his absence, it would take so long to get his breakfast that he would not be an hour a day at the store, and hence defendant had suggested that he stay in the store. Conceding these to have some relevancy, it appears, on the other hand, that there was waste which, by falling, might have caught fire from the electric wiring. Next, that Saling was apparently not very anxious to have insurance, because he insisted, first, that it be given him for an account owed him by an employee of the agent, and that it was ultimately written on agreement that Saling would pay if the employee did not. Finally, the evidence shows most clearly and by most respectable, competent and disinterested witnesses, that the Saling house was worth between $700 and $800, and would rent for $17 a month. The indictment charges that the house was insured for $600, but there is no evidence that it was insured in any amount. The indictment charges that the contents were insured for $700, but the evidence shows but $300, and there is no evidence of what they were worth.

2.

Emerson was sleeping in a hammock at the home of his sister, who is now Mrs. Madden. A Mrs. Gidley, of whom more later, says she saw Madden enter the Saling house, come out and speak to a man in a hammock; that the man rose, and the two walked toward the Saling house; and that the man was Emerson. This is all as to Emerson, except that the indictment has been dismissed as against him. There is no evidence that either Madden or Emerson knew Saling had any insurance.

3.

We have, of course, no occasion to go into Madden's case, except in so far as it bears on that of Saling. As to Madden, the sole incrimination is that by said Mrs. Gidley. She denied having any feeling against Madden, and persisted in this against specific inquiries. She finally confessed having such bias, and the chief of police testified to her having it. She knew Madden by sight. She says that, about three days before the Creston fire, he and Saling talked together in Madden's yard; that, when the second alarm sounded on the night of the fire, she saw Madden running, at a certain point on the walk on the south side of Clark Street. It is not very important that a man should run on hearing an alarm of fire; but two disinterested witnesses, Edwards, a worker in the freight house at Creston, and his wife, discredit the statement. Mrs. Edwards says she heard the alarm and, after hearing it, she jumped up and started out to see where the fire was; that she did not see or hear anyone pass from the west towards the east on that street; that she certainly would have heard anyone running on the walk, and saw no one at all going to the fire; that the sidewalk on the south side of Clark Street would be about 30 feet from where she was in her house, and she was out on the sidewalk where she could see the Saling

house.   Her husband says it was about 30 feet from where he was to the sidewalk on the south side of Clark Street; that they had their window up wide, and heard no one running or walking by the house from the west towards the east after the sounding of the alarm; that he was in bed right by the window and could have heard or seen them.

Proceeding with Mrs. Gidley: Madden went from Clark Street around the house and back porch (probably the Saling house), between the walk and the street; he had on a coat and came out in from 3 to 5 minutes without a coat, but wearing the same kind of hat that he wore when he went in. She admits that the night was dark; that she does not know the color of Madden's clothing; and that she was not close enough to say whether he had a felt or a straw hat. The State offers no suggestion why Madden should go into the house to leave his coat, or what real weight there is in the testimony that he did this. It makes no attempt to bridge the inherent improbability and irrelevancy of this testimony. Mrs. Gidley closes with stating that she saw Madden and Saling at the Madden house after the fire, and saw them go into the house, but that it didn't look like a conspiracy to her; that they were just talking to themselves.

### 4.

There is no evidence of over-insurance; none of motive on part of Madden or Emerson; and Saling could not conspire with himself. Assuming that Madden had a guilty connection with the Creston fire, there is nothing sufficient to show that either Saling or Emerson had, or that they had done that which makes them responsible for Madden. On the whole, the evidence seems to us to be utterly insufficient to show that this fire formed the subject of a criminal conspiracy between the persons charged with it.

VIII. The alleged coconspirator of the defendant Madden

has been tried, convicted, and the conviction affirmed. See *State v. Madden,* 170 Iowa 230. We may assume, for the sake of argument, that the testimony in that case and in the one in hearing goes over pretty much the same ground, and is, in the main, a repetition. The State asserts that the facts are practically the same, and that, if different, the evidence in the case now in hearing is the stronger. We have seen that some very serious matter which was probably in *Madden's* case did not get into Saling's trial. Be that as it may, we do not take judicial notice of our own records in another case, even where the opinion was introduced in evidence below, if it is not set out in the abstract on appeal. *Enix v. Miller,* 54 Iowa 551. And it is elementary that *stare decisis* does not rule on fact questions. To a certainty, it may not rule unless we have the record in both cases competently before us, and they are, in effect, alike. And even this might not be controlling. One can well conceive of a case, and the instant one is an illustration, where, though testimony were literally alike, it might be warranted to sustain one conviction, and yet to hold the other insufficiently supported. In Madden's trial, as in this, there was evidence, as is shown by concessions in argument, that Madden had committed acts tending to show that he was a confederate of Saling's. On a separate trial, we might sustain the conviction of Madden, resting on acts done by Madden, because a jury trying Madden only would find them persuasive against Madden, while the same acts of Madden's might be far from persuasive, either to the jury or us, of Saling's guilt.

IX. The indictment charges that the conspiring was done on January 24, 1913, and "on divers other days to this grand jury unknown." Possibly this should be construed to charge dates subsequent to January 14, 1913. If so, the indictment charging a conspiracy entered into on or after January, 1913, is supported by nothing but overt acts done before the con-

7. CRIMINAL LAW: verdict: sufficiency of evidence: fact holding in appeal of codefendant: effect.

spiracy was formed. But we do not feel called upon to decide this, in the condition of the appeal record.

On the whole, the evidence fails of showing more than: (1) That Madden owned some property and that it was burned; (2) that he had an opportunity to burn it; (3) that, the property being insured, this, without more, shows a motive for the burning; (4) Saling got what insurance was paid, as mortgagee.

We are constrained to hold that this is not sufficient to sustain a conviction on the charge that Saling conspired to commit arson for the purpose of injuring the insurers; wherefore, the conviction must be set aside and the judgment below —*Reversed.*

EVANS, C. J., LADD and GAYNOR, JJ., concur.