STATE OF IOWA, Appellee, v. RAY CARSON, Appellant.

**SEDUCTION:** Nonsufficient Seductive Arts. Seduction may not be
1    predicated on an indefinite and questionable promise of marriage and hasty protestations of love, evidently made for the purpose of obtaining sexual gratification from a woman who is by no means unfamiliar with the "way of a man."

**CRIMINAL LAW:** Verdicts Unsustained by Evidence. Verdicts in
2    criminal cases, even though having some support in the evidence, will be reversed if they are clearly against the clear weight of the evidence, the judgment of the trial court to the contrary notwithstanding.

*Appeal from Lucas District Court.*—D. M. ANDERSON, Judge.

FEBRUARY 19, 1919.

CONVICTION for seduction. Defendant appeals.—*Reversed and remanded.*

*J. A. Penick* and *W. Collinson,* for appellant.

*H. M. Havner,* Attorney General, *F. C. Davidson,* Assistant Attorney General, *C. F. Wennerstrum,* and *E. S. Wells,* for appellee.

SALINGER, J.—I. For the sake of prosecutrix, as well as because it would serve no useful purpose to do otherwise, we refrain from detail. Prosecutrix was but 17 at the time

of her alleged seduction, and defendant,

1. SEDUCTION:
nonsufficient
seductive arts.

about 20. But the record shows conclusively that, beginning at 15, she had such relations with men as that, while it may be true that such relations were not criminal, they were such as made her sufficiently familiar with the "way of a man" to understand the peril of permitting the defendant to take improper liberties with her at their first meeting,—one had after they had just been introduced,—to enable her to rate at its true value such promise of marriage as she testifies to. She testifies defendant solicited sexual intercourse almost at the beginning of this first meeting; that he took indecent liberties, and in connection "with carrying on that way," he began to "love" her; that she does not remember just what he said, except that, while taking these liberties, "he made the remark that he loved me and cared for me that way;" that, at one stage of soliciting intercourse, he said he thought a whole lot of her, and asked her if she could not learn to love him; that she told him she didn't know whether she could or not; that "the way he treated me and asked me to do business with him and talked that way to me, I did not believe that I could;" that, by what he said, and the taking of the liberties, he got her to lose control of herself; that she guesses he thought or knew she had lost control of herself, and thereupon "he went ahead and did his business;" that the only objection she made was she was afraid she would get herself into trouble, and did not want that to happen, and he said that, if she did, he would get her out of it. Up to this point, nothing was said about marriage. As to a promise of marriage, her testimony was this:

"He said if he got me into trouble, he would marry me—if he could not get rid of it, he would marry me. Q. Now, you would never have had intercourse with him unless he had either promised to marry you. A. No, sir. Q. And

now you state that is the reason that you had intercourse with him—because he made these promises. A. Yes, sir, because he let on like he cared for me. He told me he loved me."

The quality of the "caring" and of the protestations of love has been sufficiently set forth. It suffices to say that they were not naturally calculated to induce a fall from chastity; that the "caring" was rather brutal, and the protestations quite casual and incidental. The important factor was the belated promise of marriage. That promise was this:

"Q. He told you, if he got you into trouble he would get you out of it? A. Yes, sir. Q. Or he would marry you, —one or the other? A. Yes, sir. Q. That is the promise of marriage you speak of when you say he promised to marry you? A. Yes, sir. Q. That is the first time you were ever with him? A. Yes, sir."

In acting upon this record, we must bear in mind, too, that this testimony should not be strained against defendant, for, in the words of *State v. Haven,* 43 Iowa 181:

2. CRIMINAL LAW: verdicts unsustained by evidence.

"It is perfectly natural, and to be expected, that the prosecutrix should, as far as possible, shield herself, and cast the blame, if any there was, upon the defendant."

It is conceded that we should interfere with a conviction though the verdict is not wholly without support, if it be clearly against the weight of the evidence. See *State v. Pray,* 126 Iowa 249; *State v. Hessenius,* 165 Iowa 415; and *State v. Young,* 158 Iowa 647, at 652.

In *State v. Saling,* 177 Iowa 552, 555, 556, the cases governing the review of a conviction are collated, and held that, while we will not set aside a verdict of guilty readily, for being contrary to the weight of the evidence, we will do so more readily than if the verdict were on the civil side;

that, while we will not interfere where there is clear conflict in the evidence, we will not support the verdict if, proceeding carefully and cautiously, we must find that the verdict is against the clear weight of the evidence. We point out, in the *Saling* case, that, in *State v. O'Donnell*, 176 Iowa 337, we reversed a conviction of murder in the first degree because we find the evidence insufficient to sustain a conviction in that degree; and that *State v. Nolan*, 92 Iowa 491, is to the same effect. We conclude, in the *Saling* case, that:

"It will no more do to make the verdict of a jury conclusive in a criminal conviction of a grave felony than it would do to try criminal cases *de novo*. That neither is permissible does not in the least affect either our duty or our power to interfere with the verdict of a jury in a case where such interference is proper."

And we cannot agree that, in determining whether the evidence clearly preponderates against the verdict, the fact that the motion for new trial is overruled by the judge who heard and saw the parties and the witnesses ends the inquiry we now have. That is not true even on the civil side. See *Miller v. Paulson*, 185 Iowa —. We adhere to our statement in the *Miller* case that this advantage possessed by the trial judge is entitled to much weight on review on the law side, but also adhere to the pronouncement therein made that it is not and cannot be conclusive.

Using all due care and caution in dealing with this conviction, we are driven to hold that this verdict is against the clear weight of the evidence. Is a conviction for seduction sustained by evidence of such "seductive arts" as were here employed? If so, a seduction would occur if a stranger met a woman in the road, introduced himself by stating that he loved her, and, proceeding to take indecent liberties, then and thereby induced the woman "to lose control," and overcame the objection that intercourse solicited un-

der these conditions might get her into trouble by stating that, if that happened, he would either get rid of the child or marry. If that constitutes seductive arts and seduction, then, if the inmate of a brothel demands of a patron that, as a condition precedent to obtaining intercourse, he shall write a declaration that he loves her, and, if she conceives by him, he will either procure an abortion or marry, stages seductive arts and a seduction. We are of opinion the verdict is not warranted by the evidence. In reaching this conclusion, we are quite controlled by the elective and alternative nature of the promise testified to by prosecutrix, and the circumstances under which it was made.

We do not quarrel with the fact that, in many cases, weight is given to a promise of marriage. But, upon analysis, it will be found that no well-considered, if any, case has ever held that seduction may be found because "*a*" promise of marriage was made, and the prosecutrix testifies that she yielded to her own desires, although she finally says, on pressure by leading questions, that she would not have yielded without such promise.

Case law helps little. At some points in the presentation, the State concedes this. At others, the concession is forgotten, and decisions are urged as concluding some point or points in the appeal. *Stare decisis* cannot rule. The facts differ too much in the different cases. The case of *State v. Higdon,* 32 Iowa 262, cited by the State, is illustrative. But there is this much to be had from case law. If it be held that, upon stated facts, there is no seduction, that is authority whenever the facts, though they differ from those in the case relied on as an authority, have less probative weight than those present in the cited case. For instance, in *State v. Valvoda,* 170 Iowa 102, it is ruled that the correspondence shows the woman is not of chaste mind. The case might be authority on whether something other than correspondence showed a lack of chastity, if what was

shown indicated such lack as, or more, clearly than does correspondence in the *Valvoda* case. On this reasoning, *Baird v. Boehner*, 72 Iowa 318, supports the defendant. The only differentiation which the State attempts is to point out that the *Baird* case is a suit for damages for alleged seduction. That distinction is against the State. The plaintiff in the damage suit needed only a preponderance. A case that holds a preponderance was lacking of course holds that there was not proof beyond reasonable doubt.

Because the conviction is against the clear weight of the evidence, there must be a reversal, and the cause remanded.—*Reversed and remanded.*

LADD, C. J., EVANS, GAYNOR, and STEVENS, JJ., concur.