L. P. BAILEY, Appellee, v. FREDERICKSBURG PRODUCE ASSOCIATION, Appellant.

No. 45372.

678

DECEMBER 10, 1940.

Geiser & Donohue, for appellee.

Hallagan, Fountain, Steward & Cless and Sullivan & Scholz, for appellant.

BLISS, J.—The plaintiff, aged about 63 years at the time of the trial in December 1939, had operated a general store and gas and oil station at Williamstown for over 30 years. Daniel Garey, a farmer boy about 23 years old, at different times had driven a truck for plaintiff. About 1:15 o'clock in the afternoon of November 10, 1938, the plaintiff and Garey left the plaintiff's store to drive to Waterloo, in the plaintiff's Pontiac coupe. Arriving in Waterloo each of them went about their separate errands, after agreeing to meet at 4:30 o'clock that afternoon at the street corner near the Paramount Theater. Garey arrived shortly before the appointed time, and, plaintiff not being there, he went into a cafe and had a hot roast beef sandwich, potatoes and gravy. Plaintiff soon after came and they went for the car, stopping on the way to each drink a pint bottle of beer. On the outskirts of Waterloo, the car was stopped at a tavern for about 15 minutes, and each of them drank a pint of beer. They then drove north on highway No. 63, which has a paved roadway 18 feet wide. Garey was driving the car, as he had done throughout the trip. They drove to the town of Denver, about 12 miles north, where they stopped and had a hamburger sandwich and another pint of beer apiece. They then proceeded north on this highway for about three or four miles until they reached the Bremer County Home, on the east side of the road. It was about 6:30 or 7 o'clock in the evening. Garey was still driving. It was dark and he had the lights of the car on. Both Garey and the plaintiff testified that the car was then and had been traveling at about a speed of 50 miles an hour. As they neared this point, Garey observed three motor vehicles traveling south on the west lane of the

highway. The leading car was a Ford coupe occupied by August Wilharm, a blacksmith from Horton, and his wife. He had turned into the highway from the Plainfield road, about five and a half miles north of this point. They had traveled at a speed of about 20 miles an hour and had slowed up to make a left-hand turn across the paving to enter the driveway up to the Home. The second vehicle, and just behind Wilharm, was an International truck with a cab and a box body seven and one-half feet wide, carrying quite a heavy load of iron junk. It was driven by Joe Borg. He had seen the Wilharm car when it turned onto No. 63 from the Plainfield road. He followed this car at an estimated speed of 20 or 25 miles an hour up to the County Home. The third vehicle traveling south was the Chevrolet tractor-trailer combination of the defendant, driven by Fred Mayo. The trailer was 22 feet long and loaded with about 11,000 pounds of hogs. He testified that he had followed the other two cars for about a quarter of a mile at a speed of about 20 miles an hour. He had driven that road many times. The lights on his vehicle were all turned on. That was true of the two cars ahead. He observed the two cars slowing up for a short distance and he prepared to do likewise.

That was the situation as the plaintiff's car approached. Wilharm said he extended his left arm as he prepared to turn, but when he observed the immediate approach of plaintiff's car, he drove to his right and halfway onto the shoulder, to let the plaintiff's car pass. It did pass, traveling on the east lane of the highway and east of the black lines.

Borg testified that he made the movement of his truck correspond to that of the Wilharm car, and drove halfway onto the right shoulder. He saw plaintiff's car pass north, east of the black lines in the east lane, at a speed which he estimated to be better than 50 miles an hour. Immediately after plaintiff's car passed the Borg truck, both he and Wilharm heard the crash of the collision between defendant's truck and plaintiff's car. Each of them stopped their cars and went back to the scene of the collision. Each of them testified that the tractor part of defendant's combination was headed diagonally, southeast across the east lane of the pavement. Borg said it was about 20 yards

north of where he stopped his truck. Plaintiff's automobile was upright in the ditch east of the roadway.

Mayo testified that he never saw plaintiff's car until the crash; that he was watching the cars ahead, fearful that he might run into the heavy load of junk. The tractor portion of his combination had dual wheels and hydraulic brakes. The trailer had separate air brakes. There was a hand brake. He applied all of these brakes at once. The hand-brake arm could only be loosened with a bar, it was set so hard. He testified that he missed the rear of the Borg truck by but a few feet.

Garey testified that he passed the Wilharm and Borg cars at all times on the east lane and never crossed to his left over the black lines, and that just as he passed the Borg truck the defendant's tractor shot across the black lines directly into the east lane, colliding with plaintiff's car. Garey received a broken wrist, a broken ankle, cuts about the face and head, and was rendered unconscious.

Plaintiff was sitting to the right of the driver, relaxed and at ease and paid little attention to the traffic or the driving of his own car except that he told Garey not to drive faster than 50 miles an hour and that he did not exceed that speed. There was much traffic and he said he did not know what happened until the crash. He regained consciousness the next day.

What does the defendant's driver say?

"Q. You were afraid that night of running into the truck ahead of you? A. Yes, sir.

"Q. That's what you were trying to avoid? A. Yes, sir.

"Q. And you didn't see the Bailey car coming from the south? A. I did not.

"Q. And you made no attempt to turn to the right side or the west side? A. No.

"Q. But Fred, your tractor part missed the back end of the load of iron ahead of you, didn't it? A. Yes, sir.

"Q. And you missed it by about ten feet, isn't that correct? A. *No, I wouldn't say it was that far. I couldn't state exactly but I came awful close to it but I didn't hit it.* The tractor part in which I was riding turned to the left and was on the east side of the highway immediately after the accident and

when I got out of the cab I was on the side of the highway over which the Bailey car had traveled and the trailer part was diagonally on the west side of the paving.

"Q. And when was the first time that you saw the Bailey car? A. *I didn't see the Bailey car until the crash: I wasn't watching for cars coming from the south. I was using every effort possible not to run into the load of iron ahead of me.*

"Q. And after you applied your brakes the crash came? A. Yes, sir. That is about all I can tell you.

"Q. But you do know the position of your tractor immediately after the crash? A. Yes, sir.

"Q. *You make no claim that the Bailey car was not driving on the right side of the road, do you Fred? A. I never made that claim to anybody.*

"Q. *You make no claim that the Bailey car swerved from the right? A. I told you I can't tell just exactly how it happened. I never saw the Bailey car until after the crash.*

"Q. And whether the trailer jackknifed or not you are not sure? A. I am not. I am not telling you anything I can't back up. I know all the brakes took effect—both the emergency and the hand brake were set so hard that it took a cross bar to get the hand brake loose afterwards. I was thoroughly familiar with the road where the accident happened. It is a level stretch of paving. There was nothing to obscure the view of the cars driving north and south. I cannot account for how my tractor was headed in the southeasterly direction. All I know is that the load shoved it.

"Q. Before the crash had you brought your car to a stop? A. I tell you I can't definitely answer that. As I applied my brakes the crash came and I couldn't tell whether it was—in other words the crash came an instant after the brakes were applied."

The grounds of negligence as alleged in plaintiff's petition were in substance that defendant's truck failed to turn to the right when it met plaintiff's car approaching from the opposite direction, but turned to the left and across the black line and was driven into and against plaintiff's car, and that defendant's

truck was driven at an excessive rate of speed under the circumstances. Defendant's answer was a general denial.

I. Appellant's first assignment of error has to do with an instruction of the court relative to the consideration to be given by the jury to the beer drinking of plaintiff and Garey. This matter was first mentioned in the case by defendant's attorney telling the jury in his opening statement that he expected to prove the intoxication of plaintiff and Garey. On objection by opposing attorney, the court admonished the jury that he would definitely instruct them later on the matter. Plaintiff's attorney asked both plaintiff and Garey about their drinking on direct examination, and they were cross-examined about it. Neither side objected. The witnesses testified as we have noted, and that that was the extent of their drinking that day, and that neither of them was intoxicated at all. No one testified that they were intoxicated or gave any evidence that they were in any way affected by what they had drunk. With the exception of their own testimony, the record is silent about the whole matter. There is no evidence that there was any causal connection between the drinking and the collision. In fact, there is no evidence upon which the jury could properly base a finding that there was any negligence on the part of the plaintiff or of Garey.

The court on his own motion gave this instruction to the jury: "Evidence has been introduced pertaining to the drinking of what is called 3.2 beer by plaintiff and his driver, Daniel Garey, as they were on their way home on the afternoon of the accident. You are instructed that you may consider this as bearing on the question of contributory negligence on the part of plaintiff and said driver and for no other purpose."

Appellant urges that the court erred in so limiting the consideration of this evidence, in that it could have been considered with reference to (1) the credibility of plaintiff and Garey, and the weight of their testimony; (2) as bearing on plaintiff's habits, expectancy, and future disability; (3) the negligence of Garey and plaintiff as a proximate cause of the collision; (4) proximate cause and sudden emergency; and (5) imputed negligence. In support thereof, he cites 64 C. J. 224; Becker v. Becker, 45 Iowa 239; 3 Wigmore on Evidence, 3d Ed., section

933; State v. Nolan, 92 Iowa 491, 61 N. W. 181; State v. Feltes, 51 Iowa 495, 1 N. W. 755; State v. Castello, 62 Iowa 404, 17 N. W. 605; State v. Wheelock, 218 Iowa 178, 254 N. W. 313; White v. Zell, 224 Iowa 359, 276 N. W. 76; Simonson v. Chicago, R. I. & P. R. Co., 49 Iowa 87; Townsend v. Armstrong, 220 Iowa 396, 260 N. W. 17; Chicago, M. & St. P. R. Co. v. Holverson, 264 F. 597, 9 A. L. R. 1401. We have no occasion to discuss these cases, as we believe they have no application to the matter before us because of the difference in the facts. There is no evidence of intoxication nor of alcoholic effects. Nothing but possible conjectures. Whether there was factual warrant for the giving of the instruction we need not determine, but it was not prejudicial to the appellant. There was no question about the credibility of these witnesses, nor the weight of their testimony, with respect to what took place that evening. They are quite fully corroborated by Borg, Wilharm and Mayo. There was no issue made upon plaintiff's habits as affecting his future disability or expectancy. Certainly drinking three pints of 3.2 beer would not seriously affect either. The jury were told that they *might* consider the drinking in connection with contributory negligence. If the jurors did consider it, their verdict indicates that it had no bearing on that question. And since they found there was no contributory negligence on the part of the plaintiff and Garey, there necessarily could have been no negligence which was the sole cause, nor any imputed negligence. The assignment of error is without merit.

II. Assigned error No. 2 is based upon the giving of instruction No. 1 which set out the grounds of negligence, and instruction No. 3 which set out the first paragraph of the 1935 Code section 5029, and section 5020, without instructing the jury as to their application to the facts. Also, that the court erred in not telling the jury that failure to yield one half the road was prima facie negligence. We have no quarrel with the soundness of the rules contended for in general. But, again, we say that there was no prejudice under the facts. While one of the grounds of negligence included the failure to give one half of the traveled way by failure to turn to the right, there was in fact no evidence of any meeting upon the highway by the vehicles of the parties. The plaintiff's car was at all times on the east lane, and the

defendant's truck was at all times on the west lane, until it suddenly turned into the east lane. We question whether such a movement could be called a failure to yield one half the roadway, under the section. The court did not say that a violation of section 5020 was negligence or negligence per se, or prima facie negligence. It simply did not mention any one of them. Under the record, we do not believe this was prejudicial error.

With respect to the court's failure to instruct on any violation of section 5029 as a speed statute, it clearly appears that the rate of speed of plaintiff's car had no causal connection with the collision. We find no error in this assignment.

By having the court give its requested instruction No. 18 wherein it seeks to excuse itself by the alleged wrongful conduct of Borg and Wilharm in slowing their speed, and in having its requested instruction No. 19, relative to sudden emergency, given, the appellant, by inference, at least, concedes that its truck went into the east lane, but that there was legal excuse therefor. The jury might very well have found that appellant violated the clear distance ahead statute, or else attempted to pass the two cars ahead without keeping a proper lookout for approaching cars in the east lane.

III. In the third assignment, appellant complains of the giving of instructions Nos. 4 and 5, defining negligence and contributory negligence. It concedes that they are abstractly correct but that the court failed to instruct as to their application to the Code sections referred to in the last preceding division hereof. We have read the instructions carefully, and find no error in this matter.

IV. Appellant complains because the court failed to give its requested instruction No. 4 to the effect that the two drivers ahead of him had violated the law in stopping their cars on the highway, and that appellant's driver had a right to presume that they would not do so. The instruction assumes that they did stop their cars before the collision. The greater weight of the evidence was to the contrary. There was no error in refusing to give this instruction.

V. In this assignment, appellant complains of misconduct of the jury in returning a quotient verdict, and the court's order overruling appellant's motion for a new trial based

on that ground. Many pages of the abstracts and the arguments are used in discussing this matter. We cannot set out the various affidavits and examinations of the jurors concerning what took place in the jury room. Appellant in its argument states: "While there must be an agreement to be bound by the result, we do not believe this requires a written agreement or an express agreement. We think that the agreement to be bound might very well be implied from the conduct of the jurors." And also: "It quite conclusively appears that there was no express agreement in advance as to whether the quotient would or would not be absolutely binding." We fully agree with the last quotation. The affidavits of the jurors and their testimony is definitely that there was no such agreement. It appears that the jury first found that plaintiff should recover. Then ballots were taken on the amount, and each juror wrote what he thought was a proper amount on a slip of paper. The amounts were all substantial and ran from $6,000 to $8,000. There was very little difference in these amounts. There was considerable discussion over the matter. Some juror suggested that the amounts be averaged to see what the amount would be. There was no suggestion that the resulting quotient should be the verdict. As one juror testified:

"Each of us put down the amount we thought the plaintiff entitled to recover and handed it to George Banwell, the foreman. It was then suggested that these amounts be divided by 12 and see what the amount would be. I think most of the jurors were voting for amounts between $8,000 and $6,000. When it was divided by 12 I recall the quotient was approximately $7,286. After this quotient was announced there was discussion back and forth among the jury as to whether it was about right. We then voted on the amount of $7,250 and they all agreed upon this amount."

Another juror testified:

"It was suggested that we add up the amounts each of us was voting and divide it by 12. I think we arrived at the sum of $7,286. Some of the jurors thought this was too high. Someone suggested that we cut it to even money of $7,250 and we returned this as our verdict. I would say this occurred about a half hour before we returned our verdict.

"Q. Was it your understanding, Mr. Rings, that the figure you obtained in that manner was to be your verdict? A. No, no. It was just to see how we came out—just to get it started.

"Q. When you entered into that you entered into it with the idea that the figure you obtained wouldn't be binding upon you at all? A. No.

"Q. Wouldn't have any meaning? A. Just that we wanted to see how close we were.

"I think the lowest figure anyone put down was around $6,000 and I think the highest figure was somewhere around $8,000. There was no agreement of any kind when we divided by 12 that that was to be the verdict and that it was to be binding upon us. When the amount of $7,250 was discussed the various jurors were asked if they were satisfied with this amount."

This testimony is typical of that of other jurors.

Appellant calls attention to Thompson v. Perkins, 26 Iowa 486; Sylvester v. Town of Casey, 110 Iowa 256, 81 N. W. 455; and Carter v. Marshall Oil Co., 185 Iowa 416, 170 N. W. 798. In the last-cited case, the plaintiff was a comely 15-year-old girl who was badly disfigured by burns caused by the alleged negligence. The jurors might well have had widely varying views as to the damages. The amounts ran from $7,000 to $10,000. Eight jurors swore that the quotient was obtained merely to see if that amount might be one on which the jurors could agree. They had deliberated for a long time over the matter without agreement. In setting aside the verdict, this court said, at page 424 of 185 Iowa, page 800 of 170 N. W.:

"There was no subsequent reconsideration of the amount of the damages to be allowed. The later votes on the verdict, without any review on the merits, adopted the result obtained by the illegal process of adding the several amounts and dividing by the number of jurors, in pursuance of an agreement to be bound thereby."

The record in the case must be very liberally construed to warrant the last clause. We question the propriety of criticizing a jury which has labored long to reach a verdict satisfactory to all of them, and all of them are agreed upon a substantial sum, but cannot quite reconcile their views, when, in a spirit of com-

promise, they average the amounts to see if the sum arrived at is one upon which they might all unite. No juror can satisfy himself as to the exact amount which he thinks the verdict should be. He and all of his co-jurors can only approximate that amount. Each juror must go up or down with his amount. Averaging the amounts solely to reach a figure for discussion, as was done in this case, ought not vitiate this verdict. Splitting the difference has always been a time-honored device for the amicable settlement of monetary controversies. The trial court heard the submission of this issue and found for the appellee. We find no sound reason for disagreeing with his conclusion. See Peak v. Rhyno, 200 Iowa 864, 205 N. W. 515; Clary v. Blondel, 178 Iowa 101, 159 N. W. 604; Kime v. Owens, 191 Iowa 323, 182 N. W. 398; Frahm v. Eggers, 183 Iowa 572, 165 N. W. 994; Gutfreund v. Williams, 172 Iowa 535, 154 N. W. 753.

VI. Appellant contends that the verdict is excessive and was the result of passion and prejudice. We think there is no basis for the charge of passion and prejudice, or sympathy. The verdict is a substantial one. The injuries which plaintiff suffered were severe. The femur was broken, his face cut and his hand severely lacerated. He was in the hospital for 25 weeks. There is no question that he suffered extreme pain for a long time. Obtaining union of the fractured femur was difficult. Metallic pins had to be driven through the bone and the parts wired together. Casts were put on and removed. The limb was suspended for long periods. He was on crutches for a long time after leaving the hospital. He was still under the doctor's care at the time of the trial, over a year after the injury. Before his injury, he was in fairly good health and weighed 230 pounds, but at the time of the trial, he was still weak and weighed 170 pounds. His leg was one inch shorter because of the injury. His knee action was limited somewhat. His work included the buying and exchange of produce and livestock, making necessary the use of a truck. There was evidence that he would be somewhat handicapped in his work. His hospital bill was $789.91, doctor bill, $400, and the car damage was conceded to be $400. Damages for past pain and suffering, and for future disability can only be approximated. The jury is entitled to a wide discretion. We are constrained to hold that it did not abuse its discre-

tion. We have carefully considered all matters complained of. It is our judgment that the decision should be and it is affirmed. —Affirmed.

RICHARDS, C. J., and SAGER, HALE, HAMILTON, MITCHELL, STIGER, and OLIVER, JJ., concur.