STATE OF IOWA, Appellee, v. CLARENCE EPPS, Appellant.

**SEDUCTION:** Seductive Arts—Evidence. Seductive arts are sufficiently shown by evidence tending to show a promise by the accused to marry prosecutrix, should she become pregnant, together with protestations by the accused of love for prosecutrix and the latter's reliance thereon.

*Appeal from Poweshiek District Court.*—D. W. HAMILTON, Judge.

APRIL 1, 1924.

REHEARING DENIED SEPTEMBER 26, 1924.

THE defendant was convicted of the crime of seduction, and appeals.—*Affirmed.*

*Vernon C. Koons* and *Frank Bechly,* for appellant.

*Ben J. Gibson,* Attorney-general, *Herbert A. Huff,* Assistant Attorney-general, *Frank R. Talbott,* County Attorney, and *R. W. Boyd,* for appellee.

ARTHUR, C. J.—I.  At the close of the State's evidence, appellant moved for a directed verdict in his favor, and at the close of all the evidence, the motion was renewed.  Both motions were overruled, and errors are predicated on the rulings.  The motions were principally based on the contention of appellant that the evidence was insufficient to sustain a verdict of guilty.  The main question presented on this appeal, in different ways, by several assignments, as counsel for appellant pertinently states it, is, Was the prosecutrix in fact deceived and misled into having sexual intercourse with appellant?  For consideration of this question, we must go to the record.

The prosecutrix, Lucy Haines, at the time of the alleged seduction was eighteen and one-half years of age, unmarried, and at the time of the trial was twenty years old.  She is the daughter of a farmer, living near Brooklyn, Iowa.  She attended school until she was about fifteen years old, intermittently, spending a part of her time working on her father's farm.  During recent years she spent part of her time in the town of Brooklyn, with relatives.  She had an older sister living in Brooklyn, with whom she spent some time.  She had a brother, Walter Haines, a married man twenty-six years old, who was a section hand for the Rock Island Railroad Company, and lived in and

around Brooklyn. The first meeting of prosecutrix and defendant occurred on January 11, 1921, on the streets of Brooklyn, in front of the opera house, where she had been attending a moving picture show. Prosecutrix testified that she was standing in front of the opera house, waiting for her brother, Walter Haines, when appellant approached her, started to talk to her, and wanted to take her home; that in conversation he told her his name was Harry Johnson; that she walked with him to the home of her sister, Daisy Hervey, who lived in the extreme east part of the town of Brooklyn; that, when they got to her sister's house, she and appellant went into the house; that the family was in bed, and appellant stayed a while; that at this time he asked her if he could see her again, and she told him he could; that after that she met him regularly, sometimes at the home of her sister and sometimes at the schoolhouse near her sister's home; that these meetings kept up until about the middle of February; that sometimes he took her to the moving picture show; that they continued to meet until about the middle of February, when someone told her that appellant was married, and that his name was Clarence Epps; that, the same night that she was told that appellant's name was Clarence Epps, and not Harry Johnson, as he had told her, appellant called her up and asked her to come and see him; that she scolded him over the telephone, but finally met him, and confronted him with the information she had received,—that he was married, and that his name was Clarence Epps; that appellant then told her that he had been married, but was divorced, and stated that his name was not Clarence Epps; that finally she believed his statements, and relations were resumed between them substantially as before; that afterwards, sometime in May, he asked her if she had a car, and wanted to know why they could not take a ride; that she got a car from her brother, and drove it to Brooklyn, and met appellant at the home of Alex Sharp, who lives a block west of her sister's home, and that there she and appellant got into the car and drove out into the country; that this was the first time she had gone out with him in a conveyance; that, when they had driven out into the country a distance, the car stopped, because the wire came off the magneto point; that, when the

car stopped, she got out and cranked it, and got back into the seat with appellant; that he then put his arms around her, told her he loved her, kissed her, and took some liberties with her person, and pressed her to have intercourse with him; that she told him she would give alarm if he bothered any more; that for a time he left her alone, and then renewed his efforts; that she told him it wasn't right, and he said there wasn't any harm in it, and he would marry her if anything happened; that she then had intercourse with him; that, to use her expression, "he had bothered her a few times before that," but that was the first time she had intercourse with him; that she loved him, and that was the reason why she permitted him to have intercourse with her; that, after the occurrence in May, she had intercourse with defendant about once a week,—sometimes twice,—and became pregnant as a result of the intercourse, and had a baby born April 5, 1922; that they stopped going together in the fall of 1921.

Prosecutrix testified that she had never had sexual intercourse with any man except appellant; that, after he stopped coming to see her, in the fall of 1921, she went to Des Moines to see him, but did not get to see him, and afterwards, in February, 1922, went to Valley Junction to see him, accompanied by her brother, Walter Haines; that her brother found appellant and brought him to her at Valley Junction, and she had a talk with him, in which she told him that she was in the family way, and asked him if they could get married, and appellant said that he wouldn't marry her, that he had a wife and five children, and that his name was Clarence Epps; that appellant then said, "Why not go to an institution until the baby is born?" Prosecutrix testified that appellant said he loved her, and promised to marry her, at the time she had intercourse with him in May in the car, and that she believed him when he made said statement.

Daisy Hervey, sister of prosecutrix, who lived in Brooklyn, testified that she first met appellant at her home, when he came there with Lucy, and was introduced as "Harry Johnson;" that Lucy stayed at her home sometimes, and that appellant came to see her regularly; that appellant phoned her with reference to

meeting Lucy, and inquired whether Lucy had come to town, and said to tell her, when she did come, that he wanted to see her; that she knew of a quarrel between them; that appellant asked her what she thought of the "stuff they had been telling Lucy;" that he said it wasn't so,—that he wasn't married; that appellant and Lucy commenced going together after that, but he did not come to her house so often; that she did not know appellant by any name but "Harry Johnson;" that, when he called her up over the telephone, he gave the name of "Harry Johnson," or "Harry;" that appellant and Lucy continued going together until sometime in the fall; that he came to her house and stayed all evening with Lucy probably once a week; that sometimes the family would be in bed when appellant would be there visiting; that sometimes he would come to her house and he and Lucy would go away together.

Claude McGee, a railroad employee who had known appellant for some years, testified that he had a conversation with appellant in the summer of 1921 in regard to appellant's association with Lucy Haines, in which was said:

"I said, 'Hello, Lucy,' as he was going to the cinder pit. He got off the engine and came back, and wanted to know what I meant by that. I said, 'Going with a girl of that kind,' that didn't know any more than she did,—a man of his kind, and married. He said it was a pity a man couldn't go out and get a little without everybody knowing it."

Walter Haines, brother of prosecutrix, testified as follows:

"I am a brother of Lucy Haines'. I remember going with Lucy to Valley Junction to see Harry Johnson sometime in February, 1922, and saw him at the railroad roundhouse. There was a talk between me and Johnson, or Epps, and Lucy, up on the street in Valley Junction. She wasn't down at the roundhouse. She said, 'Mr. Johnson, I come over to see you. I think I ought to be married.' He said that he couldn't; that he was a married man,—his name was Clarence Epps. She said this was a pretty way for a married man to act. He said, 'Well, that is railroad style, isn't it, Budge?' Budge is my nickname. I said, 'It looks like some of them.' He said, 'Why don't you go to a soldier's institution,—some sort of an institution,—and work

your way through, and leave the child there?' She said, 'No, I wouldn't do that.' He said, 'I had the same sort of trouble with a girl like you in Grinnell. I gave her a few little things. I tell you, Lucy, if you are going to make any trouble and disturbance over this, I will put a hole right through there.' Lucy and I came home.''

Appellant produced six witnesses who testified that his moral character was good.

Appellant in his own behalf testified that he was thirty-four years old; that he had lived in Valley Junction twenty-two years; that he had been a locomotive fireman for fifteen years; that he was acquainted with Lucy Haines and her brother, Walter C. Haines; that he never had sexual intercourse with Lucy Haines; that he never told anyone that his name was Harry Johnson; that he told Lucy Haines, on January 22, 1921, that his name was Epps, and that he had a wife and five children. Appellant denied that he said to Walter Haines or Lucy Haines in the conversation at Valley Junction that it was railroad style to take an assumed name and go with girls away from home. He further testified that he did not tell Lucy Haines to go to an institution and work her way through and leave her baby there; that he did tell Walter Haines, in the Valley Junction conversation, that he knew a girl who had gone to an institution; that he referred to an institution at Des Moines, Iowa; that he first met prosecutrix on January 11, 1921, on the streets of Brooklyn; that he had seen her before, but had never talked with her, and never was introduced to her; that he walked within two blocks of her sister's home with her; that he met her at the schoolhouse probably four or five times; that he met her at her suggestion at places appointed, several times after that; that he called her by telephone at one time, and she arranged to meet him at the schoolhouse; that, later on, she accused him of being married, and said, ''You are a pretty man, running around with a single girl, and a married man.'' ''I said, 'I know I am married.' '' He further testified that he did not tell her at that time that he had been divorced; that he may have called her up more than once; that he could not say whether he had called her up fifteen or twenty times or not; that he did not believe he had called

her fifty times; that he would not say whether he called her up twenty times or not; that, after he and prosecutrix had a quarrel, it was about six weeks before he saw her again, in March; that he asked Daisy Hervey over the phone where Lucy was; that sometimes Lucy was at the farm, and sometimes at her sister's; that he did not go to her sister's house, the first time he met her, but went to the house to see her the following week; that he met her several times after that by appointment; that he did not call her up every time he came to town; that he could not say whether he met her in April or not; that he met her in May, and then went on a ride out in the country; that Lucy asked him if he liked to automobile ride, and he said he did, and she said she would get her brother's car and take him out riding; that he did not remember whether he called Lucy up or the Herveys, to tell her that he was in town; that he met Lucy with the car up by the schoolhouse and got into the car with her about 7 o'clock in the evening; that it was the first time he was out with Lucy in an automobile; that she drove a ways, and then turned down a hill on a byroad; that, in coasting down the hill, something went wrong with the car, and it stopped; that, when they had gotten to the bottom of the hill, the car wouldn't start; that they stopped at the bottom of the hill about half an hour, and he and Lucy sat in the car together; that he did not tell her he loved her; that he never told her he loved her; that the only affection he had for her was as a friend; that he did not put his arms around her; that someone came along and helped them start the car, and they drove on about a mile, and then went back to town; that some time after that, he and Lucy drove out to her brother Walter's; that he quit meeting her about June, about a month after the trip to Walter's; that, when he met her in Valley Junction, February, 1922, he had not seen her or any of the Haines family since June; that he and Walter then had a talk; that, when he and Walter were talking, Lucy was probably eight feet away; that the only thing he remembered Lucy's saying was that she wasn't "going to shoulder all the blame;" that Walter said, "My sister is in trouble." "I said, 'I am not responsible,—who does she blame?' He said, 'She blames you.'" He further testified that there

was something said about an institution; that he said, "I know a girl who went to an institution."

II. The law in cases of this charácter is well settled. What constitutes seductive arts and corroboration of the prosecuting witness in connecting the accused with the crime has been considered in many cases by our courts and courts of other jurisdictions. In the recent case, *State v. Rolling,* 190 Iowa 1139, the question is considered, and a large number of cases cited and quoted from; and we will not repeat them. The testimony of prosecutrix above set forth shows that appellant put his arms around her and told her that he loved her, kissed her, and took other liberties with her. Her testimony also shows that she told him that it was not right for them to have sexual intercourse, and that he said there was not any harm in it, and he would marry her if anything happened. She further testified that she yielded to his demands because she loved him and he told her he loved her, and she believed him.

Counsel for appellant argue that the testimony of prosecutrix shows that the intercourse, if it occurred, was in pursuance of a promise of marriage conditioned upon prosecutrix's becoming pregnant as a result of the intercourse, and that such conditional promise of marriage will not support a verdict of guilty in a seduction case. If the conditional promise of. marriage were all that was said and done by appellant, there would be much force in the contention. But prosecutrix also testified that she yielded to his demands because she loved him, and because he told her that he loved her, and she believed his statement that he loved her.

It has been stated in many cases, in substance, that the purpose of the use of seductive arts is to win the affection and love of a woman for the purpose of inducing her to have sexual intercourse. We think the evidence of prosecutrix sufficient to establish the use of seductive arts. The evidence is amply sufficient to connect the defendant with the crime. The testimony of Daisy Hervey shows that appellant kept company with prosecutrix, and that he came to her house to see prosecutrix frequently. The testimony of Walter Haines and Claude McGee as

to admissions of appellant is sufficient to connect appellant with the crime.

III. Error is predicated upon some language used by the county attorney in his closing argument to the jury. It is not necessary to set forth the portion of the argument complained of. We have carefully examined same, and think the criticism is not warranted. We think the court did not err in refusing to grant a new trial on the ground of the claimed misconduct of the county attorney in argument. Denial of a new trial on that ground was not an abuse of discretion. We think the argument used by the county attorney did not exceed reasonable limits, and was fairly relevant to the case, and a fair deduction from the evidence.

IV. Several other assignments of error are based upon rulings of the court on the reception and exclusion of evidence and in circumscribing cross-examination. We do not deem it necessary or profitable to discuss these assignments. We have carefully examined each assignment, and find no error which would justify reversal.

Also, error is predicated on refusal to give some requested instructions and on the giving of certain instructions. We have carefully examined the instructions, and find no error. We think that appellant was accorded a fair trial, and that the verdict has sufficient support in the evidence.

Results in affirmance of the case.—*Affirmed.*

STEVENS, DE GRAFF, and VERMILION, JJ., concur.