STATE OF IOWA, Appellee, v. BERNARD WEAVER, Appellant.

**SEDUCTION:** **Nature of Seductive Arts—Jury Question.** Evidence
1 tending to show a promise by an accused "to stand by" prosecutrix in case she became pregnant, in connection with the use of flattery and protestations of affection, reviewed, and held to present a jury question on the issue of the seduction of a 16-year-old girl.

**SEDUCTION:** **Corroboration—Sufficiency.** Evidence aside from that of
2 prosecutrix, tending to show that prosecutrix and the accused were affectionate in their relations, that the accused referred to prosecutrix as his wife, and that later he attempted to induce other men to swear falsely as to the unchastity of the prosecutrix, may be ample to constitute the statutory corroboration.

**CRIMINAL LAW:** **Trial—Compelling Production of Exhibit.** A de-
3 fendant in a criminal prosecution may not complain that the court compelled him to produce an exhibit for the inspection and use of the State, (1) when the exhibit was the private property of the prosecutrix, and had been surreptitiously obtained by the defendant, and (2) when the defendant had employed the exhibit in the cross-examination of the prosecutrix, and had read portions of it into the record.

*Appeal from Woodbury District Court.*—MILES W. NEWBY,
Judge.

NOVEMBER 19, 1924.

THE defendant was convicted of the crime of seduction.
From the judgment pronounced on the verdict, he appeals.—
*Affirmed.*

*Yeaman & Yeaman,* for appellant.

*Ben J. Gibson,* Attorney-general, *Herbert A. Huff,* Assist-
ant Attorney-general, *O. T. Naglestad,* County Attorney, and
*Ray E. Rieke,* Assistant County Attorney, for appellee.

VERMILION, J.—But two questions are raised on this appeal.
The first, and the one chiefly relied upon by the appellant, is the
sufficiency of the evidence to sustain the verdict of guilty. As
presented by counsel for appellant, two propositions are in-
volved: (1) Whether there is sufficient evidence of seduction,—
that is, the use by appellant of seductive arts under the influence
of which prosecutrix surrendered her. virtue; and (2) whether
there is sufficient corroboration of her testimony.

The prosecutrix, Ethel Jackoway, at the time of the com-
mission of the alleged offense was sixteen years old, and resided
with her parents, two unmarried sisters, and two younger broth-
ers, in the town of Moville. A schoolgirl, Marjorie Williams,
boarded with them. The father of the prosecutrix was a laborer.
The appellant's father had for some time been living alone in
a house next door; and in February, 1922, appellant came from
Ohio, where he had been working on a railroad, and joined his
father. Appellant was twenty-three years old. On the Sunday
following his arrival, he attended church, and saw the Jackoway
girls and Marjorie Williams in the choir. A few days later, one
of the sisters of prosecutrix sent him an invitation to attend a
Washington's Birthday party, to be given in the basement of
the church. On the next Sunday, appellant presented himself
at the Jackoway house and introduced himself. From then until

his return to Ohio, in October, he was much at the house, and frequently in company with one or more of the girls living there. It quite clearly appears from all the testimony that the Jackoway girls, Marjorie Williams, and at times other girls, were frequently together and frequently with the appellant and other young men and boys. They attended meetings at the church, moving picture shows, and parties in the town and country surrounding, and went automobile riding. The girls met men and boys informally on the street, and without introduction, and frequently remained out to a late hour. They played cards at the appellant's home, and with his father, and at the home of the married sister of the prosecutrix. Much of what they did was innocent, and but the seeking of youth for entertainment and diversion, and not materially different from the things indulged in by other young people of their age and station. There is evidence of some looseness of morals on the part of some of them, and that the prosecutrix had been indiscreet, and much on the street, and some testimony that, prior to her alleged seduction, she had permitted improper liberties; but her previous chastity was clearly a question for the jury, and it is not seriously insisted that the evidence would not warrant a finding of her previous chaste character.

That appellant took part in many of these activities and was frequently at the Jackoway home and in company with some of the girls living there, is not denied. He claims to have been especially attentive to Marjorie Williams; that they were sweethearts, and were keeping company: and in this the Williams girl corroborates him. The prosecutrix admitted that he was "going with" Marjorie, but also testified that she frequently went with them to church services and elsewhere, and that he frequently accompanied her alone to the home of a married sister; that she saw him almost every day from the time they met; and that he came to her house almost every day. She further testified that, after she had been going with him for about a month, he told her he thought she was "an awful nice girl," and that he liked her as well as he did any other girl he had ever seen, that he liked a blond girl, and if he ever married a girl, he would marry a girl with blue eyes and blond hair, and that he thought she was "an

awful nice girl;'' that these remarks were frequently repeated; that she was out with him quite often when she was alone with him; that, on April 30th, after church, she and her sister were riding with another young man, Charlie Roesche, and met the appellant on the street, and Roesche asked him to go for a ride; that he got in the car, and they drove to a place called Lover's Lane, and stopped and talked, all remaining in the car together; that they then drove back to town and stopped the car in an alley near the sidewalk; and that, after remaining in the car talking, for about ten minutes, the appellant said it was crowded, and suggested that she accompany him to his truck, which was about halfway down the alley; that she and the defendant went down to and got into the truck; that the defendant told her how much he thought of her and how well he liked her; that she believed what he said at the time; that he had told her those things a number of times before, and that she had then learned to love him; that he placed his arms about her, repeating how well he loved her and what a nice girl he thought she was; that he then tried to put his hands under her clothes, and said there wasn't any harm in young folks' having a good time when they were out together; that he said he knew how to keep from having children,—that his mother and father had been married for a long time, and he was the only one they ever had; that he said he knew how, and if he did get her into trouble, he would stay by her, and that she needn't be afraid; that she believed him and relied on him, and they then had sexual intercourse; and that that was the first time she ever had sexual intercourse with him or any other man. She further testified that the reason she did so was because he promised to stay by her, and she thought lots of him and he said he thought lots of her; that she did not just do it because she wanted to; and that he had asked her several times before this; that he had many times before put his arms around her, at which time he told her how much he thought of her; and that he had tried on three or four previous occasions to put his hand under her dress. Her attention was called, on cross-examination, to an entry, under date of April 27th, in a diary kept by her, which was read into the record, as follows:

''Us kids all went for a ride on the pavement; took B. [the

appellant] outside of the barn and had a little talk with him. He asked me a very important question, which I am to think over and answer sometime.''

Concerning this, she testified:

''Well, he asked me if I wouldn·'t go out some night with him and have a little fun, is what he asked me.''

She testified that she understood what he meant, and that he was standing with his arms around her and kissed her when he asked her, and that she laughed, and told him she would think it over. She explained their being at the barn and going outside by saying that he kept his car in her father's barn, and they went for a ride; and that she had received a letter from a cousin, with a message for him; and that, when she told him she had something to tell him, he said ''to come outside.'' The prosecutrix testified to subsequent acts of intercourse during the summer and the month of September. It is undisputed that she gave birth to a child on May 28, 1923.

It is well settled that the exact amount or kind of seductive arts necessary to establish the offense of seduction cannot be defined.

''Every case must depend upon its own peculiar circumstances, together with the condition in life, advantages, age, and intelligence of the parties.'' *State v. Higdon,* 32 Iowa 262; *State v. Hughes,* 106 Iowa 125; *State v. Rolling,* 190 Iowa 1139.

The crime may be committed by the use of seductive and deceptive artifices, in the absence of a promise of marriage. *State v. Hayes,* 105 Iowa 82; *State v. Hamann,* 109 Iowa 646; *State v. Hemm,* 82 Iowa 609. A promise to marry the prosecutrix, conditioned upon her becoming pregnant, in connection with the use of flattery and protestations of affection, may constitute seduction. *State v. Epps,* 198 Iowa 580; *State v. Price,* 157 Iowa 412; *State v. Hughes,* supra.

1. SEDUCTION: nature of seductive arts: jury question.

Here, the testimony of the prosecutrix is to the effect that appellant had frequently declared his affection for her, flattered her, and caressed her, and that he had repeatedly solicited her to have intercourse with him, and on the occasion when she consented, said it wasn't any harm; that she need not be afraid;

that he knew how to keep from having children, and would-stand by her if he got her into trouble. That these promises were false, subsequent events established. *State v. Hemm,* supra.

Stress is put upon the admission of the prosecutrix that, when she accompanied the appellant to the truck, at the time she claimed the first act of intercourse occurred, she knew what they were going for, and that the intercourse took place within ten minutes after they got into the truck. In connection with her testimony as to his previous solicitation and her promise to think it over, as shown by the entry in her diary, read into the record by counsel for appellant, we think this, so far from being conclusive that she did not yield because of his use of seductive artifices, tends rather to show that they had been effectual to accomplish his purpose, and that she yielded her virtue because of his previous persistent and artful persuasion and flattery, rather than because of her own passion. It is well settled that the jury was not confined, in the consideration of the case, to the circumstances immediately surrounding the act of intercourse, nor to the promises then made. *State v. Price,* supra. *State v. Hughes,* supra; *State v. Rolling,* supra.

Nor do we think that his claimed relations with the Williams girl, or the knowledge of the prosecutrix that he was also attentive to her, require us, under the circumstances shown in the record, to say that the crime of seduction was not committed. *State v. Hughes,* supra.

There are contradictions in the testimony of the prosecutrix, and her conduct in associating with other young men after her claimed seduction is, to an extent, inconsistent with her story; but, upon the whole record, we are satisfied that the case was properly submitted to the jury, and that the evidence is sufficient upon this point to sustain the verdict.

There was also sufficient corroboration of the testimony of the prosecutrix. The appellant's intimacy with the family and the fact that he frequently was in the company of prosecutrix and the Williams girl are abundantly estab-

2. SEDUCTION: corroboration: sufficiency.

lished, and, indeed, are not denied. The married half sister of the prosecutrix testified that appel-

lant had frequently escorted the prosecutrix to her home; that he frequently made complimentary and flattering remarks to her; that on one occasion he told her she was the sweetest thing he had ever seen, that she had a pretty complexion, and that he was going to kiss her; that, when she "ducked around the corner," he followed. Another sister, Irene, testified that she was in the front seat of the car when appellant and prosecutrix left it, to go to the truck, on the occasion when it is claimed the first intercourse took place; that they had been in the back seat, and appellant had his arms around the prosecutrix and kissed her two or three times.

The appellant testified that the prosecutrix told him in the spring that she was pregnant; that, about May 15th, she wrote him a note, and told him to come over; that he went over, and she told him not to tell her mother that she was "that way;" that she wanted him to go to Sioux City and see if he could not get somebody to help; that he understood her perfectly; that later, in a letter to him, she said:

"What I told you isn't so, but I was very scared for a while and I missed one month for reasons unknown."

The appellant denied that he ever had intercourse with the prosecutrix, and testified that he had not the slightest idea why she asked him to help her; but that he told her he would see about it.

There is also testimony to the effect that appellant tried to induce witnesses who had told him they had not had sexual intercourse with the prosecutrix, to testify that they had had such relations with her; and that he approached one of these witnesses with the remark, "I hear you have been flirting with my wife." The testimony goes much further than proof of mere opportunity to commit the offense. Nor does it merely corroborate her by showing their association as lovers; it goes to the very fact of his use of some of the means adopted by him to secure her consent. When this is considered in connection with the testimony as to his reference to her as his wife, and his attempts to procure witnesses to testify falsely on his behalf, we cannot say there was no testimony tending to corroborate her and to connect him

with the commission of the offense. Its weight and sufficiency for that purpose were for the jury.

The only other assignment of error relates to the order of the trial court requiring counsel for appellant to turn over to the county attorney the diary kept by the prosecutrix. In this diary the prosecutrix had recorded the events of her daily life in considerable detail. This book, by some means wholly unexplained, came into the possession of the appellant. It was used at length in the cross-examination of the prosecutrix. On redirect examination, the county attorney asked, and the court required, counsel for the defendant to turn the diary over to him; and he used it in the further examination of the prosecutrix. The contention is that this required the appellant to furnish evidence against himself, and to incriminate himself.

3. CRIMINAL LAW: trial: compelling production of exhibit.

It is a sufficient answer to this contention to say that the diary was not the property of the appellant, and that he had no right whatever to it, so far as the record discloses. The constitutional right to object to the production of books and papers under proper process because they tend to incriminate applies only to such as are the private property of the party. *Essgee Co. v. United States,* 262 U. S. 151 (67 L. Ed. 917); *Wilson v. United States,* 221 U. S. 361 (55 L. Ed. 771); *Wheeler v. United States,* 226 U. S. 478 (57 L. Ed. 309); *Le More v. United States,* 253 Fed. 887; *People v. Coombs,* 158 N. Y. 532 (53 N. E. 527); *State v. Strait,* 94 Minn. 384 (102 N. W. 913); *Ex parte Hedden,* 29 Nev. 352 (90 Pac. 737).

Furthermore, the appellant had produced the diary in court, had used it in the cross-examination of the prosecutrix, and had read parts of it into the record as a part of her cross-examination. He had clearly waived any right to object to the production of the book or to its use by the county attorney in the re-examination of the prosecutrix. *Perlman v. United States,* 247 U. S. 7 (62 L. Ed. 950); *State v. Tonn,* 195 Iowa 94. The diary had evidently come into the possession of defendant by some surreptitious means, and without the consent of the prosecutrix. It was used in her cross-examination in the effort to contradict and break down her testimony. It would be a strange and unjust

rule that would deny to the State the right to use it in re-examination and in affording her an opportunity to explain the entries there found. The error assigned does not go to the use made of the book by the State, but to the order requiring that it be turned over to the county attorney. There was no error in this respect.

The judgment is—*Affirmed*.

ARTHUR, C. J., and EVANS and FAVILLE, JJ., concur.