STATE OF IOWA, Appellee, v. ALVIN MOSS, Appellant.

**SEDUCTION:** Non-reliance on Artifice. A record in a prosecution for seduction which, in view of the character, conduct, and knowledge of the prosecutrix, fails to show that she relied on the alleged artifice and deception, necessarily shows an unsupported verdict.

Headnote 1: 35 Cyc. p. 1333.

*Appeal from Monona District Court.*—MILES W. NEWBY, Judge.

JUNE 21, 1926.

The defendant appeals from a conviction for seduction.— *Reversed.*

*Prichard & Prichard,* for appellant.

*Ben J. Gibson,* Attorney-general, *O. P. Bennett,* County Attorney, and *O. D. Nickle,* for appellee.

DE GRAFF, C. J.—The defendant was indicted January 13, 1925, for the crime of seduction, alleged to have been committed June 11, 1924.

The primary question on this appeal involves the sufficiency of the evidence to sustain the verdict. We therefore inquire whether from the whole record there is such a want of support for the verdict as requires a reversal. This alleged want of support is directed not only to the artifice used, but to the previous chaste character of the prosecutrix and to the statutory corroboration.

The gist of the crime of seduction is artifice, deceptive in character. It is vital that the State establish, beyond a reasonable doubt, not only the falsity of the promise made or artifice used, but also that the prosecutrix relied thereon.

Seduction may not be accomplished by a promise that is not false. *State v. Martinsen,* 198 Iowa 1325. The crime is not committed without the female's being deceived into consenting to the intercourse. *State v. Hamann,* 109 Iowa 646, with cases cited; *State v. Coffman,* 112 Iowa 8. Not only the lexicogra-

phers, but also the law, give the word "seduction" a well de-
fined meaning, although each case must be decided on its own
facts.   Not every promise or inducement followed by sexual
intercourse is sufficient to constitute seduction.

What are the facts disclosed by the record before us?  The
prosecutrix was not an unsophisticated girl.  She was 19 years
of age, and had been acquainted with the defendant for a con-
siderable period of time.  She had been seduced by him, accord-
ing to her testimony, by the same promise and artifice on a prior
occasion, to wit, in the year 1923.  The inference is that the
defendant, in order to avoid the first prosecution for seduction,
married the prosecutrix on the first day of November, 1923.
From the date of the marriage, she lived with the defendant at
the home of his father, in Castana, Iowa, until she obtained a
divorce from him, by default, on the 6th day of May, 1924, on
the ground of cruel and inhuman treatment.  On the instant
seduction trial, she admits that she "swore to a lie, to get the
divorce."

After she secured the divorce, she lived with the defendant's
grandparents at Castana, and worked in a restaurant most of
the time.  She saw the defendant every day, but he did not
speak to her after their separation until the 11th day of June—
about five weeks after her divorce.  She relates that on that day
he invited her to take an auto ride.  She testifies:

"I met him about a block from the skating rink.  He had a
big red car.  I think it was a Velie.  It was a car from Davis
garage, where he was working.  I stood by the car for a few
moments and hesitated about getting in, because I figured that
we couldn't live together once, and we couldn't again; and I
figured that, if we went out together, that would happen again."

According to her story, it did happen again.  They drove
northeast of Castana, and sat in the car and talked a while.  She
further testifies:

"He wanted me to get out of the car.  He said he had been
working at the garage, and had been riding in the car all day,
and was tired.  So we got out of the car, and was sitting under a
tree.  He said that he would just as soon go with me as any
other girl; that he knew I felt down on him because he didn't
live with me and do what was right, but I needn't blame him,—
he blamed his mother.  We were there quite a little while before

anything happened. He picked me up about 9 or 9:30. He
promised me that, if I got in that condition, he would marry me
and stay by me. He made love to me, and I submitted to him.
I believed him when he told me that he would look after me in
case anything happened. It was about 12 o'clock when I got
home. After that, I was with him two or three times each
month. I was living at that time at his grandparents', with my
baby. The last time I went with him was the last two weeks in
August. I am now in a family way.''

She testified, on cross-examination, that she had the de-
fendant arrested for seduction, prior to their marriage.

''The same charge that I am making now. I accused him at
that time, in the information, that he seduced me by making
false promises to marry me, and I stated that he had failed to
keep his promise. I knew that he had failed to keep those
promises.''

Referring to the act upon which the instant indictment is
based, she further testified:

''He told me that, if he got me in this condition, that he
would marry me and stay by me; and I told him that the first
thing he would do would be to run away. In a way, he told me
the same things he told me when he seduced me before, and he
had lied to me at that. I don't know that I believe he would lie
to me again. He didn't tell me that he would marry me if
nothing happened.''

If he expressed love for her, it is not otherwise shown than
by her statement of the conversation on the evening in question.
It is apparent that she did what she contemplated would be
done, and what she felt would be the defendant's desire to do,
and that that was the basic reason for his invitation to her to
take an auto ride.

Her former relations with the defendant and her experi-
ence cannot be ignored, as they have a most material bearing on
her claim of inducement and her alleged reliance thereon. The
sign at the crossroads was before her: ''Stop and look, but do
not listen.'' She knew he had failed her on a prior occasion
when a similar promise was made and an artful practice was
used, and she admitted on this trial that he had lied to her once
and would probably do it again.

She is not in a position to say that, ''where ignorance is

bliss, 'tis folly to be wise,'' or that she had known ''no bliss but that which virtue gives.'' Her past relations with the defendant would naturally tend to encourage sexual desire and stimulate passion. Furthermore, it is shown what her disposition was toward men. Though we do not impute unchastity to her, the evidence clearly shows her inclination.

On the first Saturday night after she secured her divorce, she was in the company of a young man who ''hugged and kissed her.'' Subsequently to that evening, not fewer than six young men kept her company at different times, and apparently on each of these occasions there was what is denominated in modern phraseology ''a petting party.''

Upon cross-examination as to these incidents, and in reply to the inquiry whether a certain young man, whom she went with but once, had kissed her, and by way of an explanation of her affirmative answer, she said: ''Well, I would like to see the man that you go out with that didn't kiss you.'' On another occasion, she did not remember whether her male companion had kissed her or not. At another time, she said that her companion did not put his arm around her because he was asleep all the way home. ''I don't know whether he was drunk or not. He didn't say.'' She finally admitted: ''All these men that I have stated, put their arms around me and kissed me since I got the divorce from my husband.''

We will not review the evidence further. We are not favorably impressed with the record facts. The statute denouncing seduction is intended for the protection of a female who, by reason of a false promise, inducement, or artifice, was drawn aside from the pathway of virtue and yielded to the defendant on account thereof. The statute was intended to shield the chaste in mind, as well as in conduct. *State v. Valvoda,* 170 Iowa 102; *State v. Carson,* 185 Iowa 568.

We are also persuaded, upon a careful review of the record, that the State has failed to establish corroboration tending to connect the defendant with the commission of the offense. Section 13900, Code of 1924. It is well established that evidence of mere acquaintanceship, opportunity, or birth of a child does not, singly or collectively, meet the statutory requirement on corroboration; and for a stronger reason, the facts testified to by the prosecutrix cannot be considered as corroboration. *State v.*

*Lenihan,* 88 Iowa 670; *State v. Enke,* 85 Iowa 35; *State v. Carter,* 196 Iowa 738.

The only semblance of an attempt to corroborate is the fact that the defendant, pursuant to a prior plan, went to Chicago. The defendant did not conceal his whereabouts, and during his short stay in Chicago wrote letters to his parents and to his grandparents, with whom the prosecutrix was then living. These letters were in envelopes which contained his name and address printed thereon. The prosecutrix heard or read all of the letters thus received. He voluntarily came back to the home of his parents in Castana, and she knew of his coming. This was before the filing of the information and his arrest. There was no flight, and the evidence cannot be so construed.

For the reasons indicated herein, the motion of the defendant for a directed verdict at the close of the State's testimony should have been sustained. Wherefore, the judgment entered is—*Reversed.*

STEVENS, FAVILLE, and VERMILION, JJ., concur.