STATE OF IOWA, Appellee, v. KERMIT MARKER, Appellant.

No. 46697.

DECEMBER 11, 1945.

G. C. Stuart, of Chariton, and Joe H. Johnson, of Knoxville, for appellant.

John M. Rankin, Attorney General, Charles H. Scholz, Assistant Attorney General, Leon N. Miller, County Attorney, and N. D. Shinn, Special Counsel, of Knoxville, for appellee.

MILLER, C. J.—On June 23, 1944, Betty Polito filed an information with C. A. Bruce, Justice of the Peace, asserting that defendant did, on April 16, 1943, debauch an unmarried woman of previously chaste character. Preliminary hearing was had on August 6, 1944. The following day defendant was bound over to the grand jury. On October 11, 1944, defendant was indicted for having, on August 28, 1943, seduced and debauched Betty Polito, an unmarried person of previously chaste character, in violation of section 12970, Code, 1939. During the trial, the allegation as to the date of the

offense was again changed by an amendment to the indictment, which alleged that the seduction occurred on or about March 30, 1943. The jury returned a verdict of guilty. Defendant was sentenced to five years' imprisonment in the Men's Reformatory at Anamosa and appeals to this court.

■ I. The first assignment of error asserts that the court erred in overruling defendant's motion for a directed verdict, made at the conclusion of the State's case and renewed at the end of all the evidence, because, on the entire record, the evidence was not sufficient to sustain a verdict of guilty. Accordingly, it is necessary for us to pass upon the sufficiency of the evidence herein as it pertains to prosecutrix' claim that by reason of some artifice, deception, flattery, false promise, or like inducement she yielded up her virtue, and whether her testimony in this regard is sufficiently corroborated.

Prosecutrix testified: She became seventeen years of age on September 16, 1944; her baby daughter, Carolyn, had been born May 31, 1944; she first learned that she was pregnant in September 1943 (from this it is deducible that conception occurred in August 1943, before she became sixteen years of age); she had known defendant since May 1942; when she was introduced to him he asked her to go for a ride with him that night but she declined; several times after that she met defendant either coming from work or going to it and he usually picked her up and gave her a ride; in 1942 that occurred more often than once a month; up until Christmas that year their meetings were always in the daytime and defendant let her out down at the public highway in front of her home on a farm; he acted all right, as if he liked her; on several occasions he was very flattering, said she was pretty and that he liked her "an awful lot." Betty further testified that on Christmas Eve, 1942, she invited Kermit and his two sisters, Fern and Doris, and Fern's friend, Paul Vanderlinden, over to supper; Betty was with Kermit that night.

She further testified:

"The next time we were associated together was on a Saturday night in January. Paul Vanderlinden came home with Kermit, Fern and myself. Kermit was driving his own car and I was riding in the front seat with him and Fern and

Paul were in the back seat. Fern asked me to stay all night with her but I told her I couldn't but when they got to our corner he didn't believe me or understand me and took me on over there. * * * I began to cry because I knew what I would get if I stayed there all night. * * * We left Paul and Fern there and he took me home. It must have been about 12:30 or maybe a quarter of one when I got in that night. After that I would see Kermit sometimes in the week and sometimes on Saturday night. Kermit talked to me and usually would say, 'I will be up after you Saturday night,' or just some remark like that. * * * After January to the first of March, 1943, I would see Kermit about twice, maybe three times a week and in March I saw him about the same number of times. Q. Now, during this time here of your starting to be associated together, did he ever make any advancements toward you, asking for sexual relations? A. Yes, sir. Q. What did you tell him? A. I tried to explain to Kermit I just wasn't that kind of a girl and that I didn't intend to have sexual relationship with anyone until I was married. Q. And what did he say then? A. He just let it go at that. During the month of March I recall being parked in the car in the lane down to our home. * * * Latter part of March. * * * 1943. * * * When he got on the other side of our gate he stopped and I asked what he stopped for and he said he wanted to talk to me. We began talking about one thing and another, nothing in particular, and it was getting late and he had the lights off, and pretty soon switched them on right away * * * Then I looked out the window and Dad was coming and didn't have a hat on, and he looked very angry * * * Dad says, 'It is just about time you got home. You have been down town long enough for just going after a truck.' Dad turned around and went home and I began to cry because Dad scolded me in front of Kermit. Q. All right, what else was said then between you and Kermit? A. Well, Kermit said, 'If that is the way he feels about it we will get married.' Q. And what did you say to that? A. I said, 'All right.' Q. * * * now up to that time * * * had [there] been any sexual relationship between you and Kermit? A. No, sir. Q. And was there that night? A. I don't exactly

recall. Q. * * * Now, how often before had he made advancements toward you * * * ? A. Well, several times. I had dates with him after that incident. Q. And about when then, Betty, would be the first approximate date he had any sexual relations with you? A. Latter part of March, around Kermit's birthday. * * * the 30th of March * * * Along there somewhere, I wouldn't know for sure. Q. Where were you when this first act occurred? * * * A. Oh, in Kermit's car in our lane. * * * Q. That is in Marion County, Iowa? A. Yes, sir. Q. * * * what was said at that time before you had these relationships? A. Well, I told Kermit I was afraid of what might happen. Q. What did he say to that? A. Well, he told me not to be afraid of anything, that we would get married, if anything happened he would stand by me, and couldn't get married right away, but we would as soon as he got enough money. Q. What did you tell him you were afraid might happen? A. * * * I told him I was afraid I would become pregnant. * * * Q. What did you talk about? A. Oh, mostly about, I would say we had a good time or something, the usual thing, then he would begin to talk about ourselves. Q. * * * would this be after or before the night your father came down to the car? A. After. I would say about a week or two after. Q. * * * What was the reason that you submitted to him to satisfy his sexual desires? * * * A. Well, as I understood it, we loved each other. Kermit told me he loved me. * * * Naturally, I told him I loved him and Kermit promised to marry me and stand by me and protect me and provide a home for me. He had never lied to me before, and I believed him. Q. And I will inquire particularly if you had ever had any relations of this kind with any other man in this world any time? A. No. No, sir. After that, this occurred about every other week and continued that way during the summer of 1943. This first act took place in the front seat of Kermit's car. Several times after that something was said about getting married. Q. When? A. Oh, after I became pregnant for one time. First Kermit said, 'let's get married,' and then he got the excuse again he didn't have any money * * * It must have been the latter part of August when I became pregnant because I

knew about the middle of September, 1943. As soon as I knew, the first time I saw Kermit I told him and that was on a Saturday night. At first he didn't believe me and after he found I was in earnest about it he said we would be married. Q. And what did you say to him in response to that? A. Well, I just said, 'All right.' And then he said that he didn't think that was a very good idea because he didn't have any money so he suggested that I wouldn't have the baby. * * * After Kermit was informed by me of my condition I saw him about as usual until he moved to town, I think in January, 1944, and after he moved to town there were times I would see him on Saturday night but not very often. Between the time I told him and January, we talked about getting married every time we were together and he would reassure me everything was going to be all right and we would get married and there wouldn't be any talk about it. * * * Q. I will inquire this way, if at any time prior to your agreeing to marry him and him asking you to marry him, if you ever had any sexual relationship? A. No, sir.''

Several witnesses testified that at the preliminary hearing Kermit admitted that he had had sexual intercourse with Betty, without specifying the time. On the witness stand herein, he admitted such intercourse but insisted that it occurred but once, in February 1944, after he had heard that Betty was pregnant. There was testimony from Betty and her parents that in November 1944, when Carolyn was six months old and defendant was under indictment herein, defendant went to the Polito home, recognized Carolyn as his child, and arranged to marry Betty. Later he went to Waterloo to get work. A letter written to Betty from Waterloo was introduced in evidence as Exhibit A without objection and, as a witness herein, Kermit admitted that he wrote it. It was as follows:

''Waterloo, Iowa, Nov. 14, 1944. Dearest Betty. How are you and Carolyn. I hope OK. I told you I would come out the first of the week But I got a job up here and I can make pretty good money. And I had to get a job before we

would get married. We don't get paid until a week from this Friday. If you could get the license we could get married a week from this Sat. I would get off up here at Six Sat morning and come down and we could get married Sat. night. I think I can make between $50 and $75 a week up here driving. I am working night. It rained us out tonight so I am going to drive tomorrow and tomorrow night. That will be twenty straight hr. Well had better close and get some sleep as I am pretty sleepy. Tell Carolyn hello. Lots of love   Kermit   Write in care of the Plaza Hotel, Waterloo, Ia. Write soon.''

On cross-examination Betty testified as follows:

''Two of the boys I went with would hug and kiss me. Those two were Ray Vanderlinden and Kermit Marker. * * * Just two boys ever kiss you in your life? A. No sir. Q. Well * * * between November, 1942, and up to the time that your baby was born. A. Boys that kissed me? Q. Yes * * * A. Paul Allen. He did not take me home. * * * I know Billy Nichols but I never went with him. Q. Ever kiss Billy Nichols? A. Yes. I kissed him myself. This is one time I didn't leave it up to the boy. * * * In November and December, 1942, Kermit was going with so many girls, I don't know whether he was going with a girl over at Pella or not. * * * In the early part of 1943, I know that Kermit started going with a girl in Knoxville by the name of Margery Goebel. Q. Then when he started going with her he would bring you and Fern in here and leave you at the dance and he would go spend the evening with Margery Goebel and pick you girls up and take you home? A. I don't know where Kermit went after he left us. I know he liked to play pool. He might have been playing pool, I don't know. Q. Never danced with you in his life? A. He didn't know how to dance then. Q. He never danced with you in his life? A. No. * * * Well, he took me up to the dance, waited for me, when I got out of the dance, took me home when Fern wasn't there. Q. Stay all during the dance and wait for you? A. Not all during the dance, no. Q. Never did that in his life did he? A. No. I know Margery Goebel and I

knew Kermit was going with her. Q. And you knew that he became engaged to her? A. After I was engaged to Kermit, yes, sir. Q. He was engaged to you then, and he was engaged to Margery too? A. The only difference was, she had a diamond and I didn't. Q. He gave her a diamond ring and he gave you nothing? A. That is right. I saw the diamond ring before Margery did. Q. He showed it to you and then took the ring in and gave it to Margery in July, 1943? A. Yes, sir. Q. And you claim that by reason of his promise of marriage to you, that you submitted to sexual intercourse the next month, in August, 1943? A. I had sexual relation with Kermit in August, yes. Q. And you knew at the time that you did it in August, 1943, that he had given to this girl, Margery, a diamond ring and was engaged to marry her? A. She didn't have a diamond ring at the time, sir. He gave her the ring in July but she didn't keep it, she gave it back two or three times, she wasn't engaged to him at all, hardly. Q. Did you know she gave the ring back before August? A. Yes. * * * I said I was keeping company with Ray Vanderlinden in 1942. I had been out with him and he had made advances toward me before I was 15 years old. * * * I did not know whether I could handle Ray Vanderlinden or not. I got to where I said I was kind of afraid to go out with him in the car, but I went with him between November 10th, 1942, and March, 1943. Q. And you made love to him and you hugged him and kissed him, didn't you? A. I believe Ray done all the hugging and kissing. Q. Well, you let him do it then? A. Yes, sir. * * * I had been with Ray Vanderlinden and he tried to have sexual intercourse with me before November 10th and before I wrote the letter Exhibit '4'. I did not expect he would try the same thing when I was out with him again. Q. You said in your letter that you were afraid to go out with him for what he would try to do? * * * A. Yes, sir. Q. But you did continue to go with him? A. Yes, sir. * * * Later on I wrote Fern telling her that I just couldn't handle Ray that he had too much muscle and that is true. Q. Well, then he did attempt to have sexual intercourse with you, didn't he, after November, 1942? A. I didn't deny that. Q. * * * Now did he or didn't

he? A. He did. Q. And you did go right back and go with him again? A. Yes, sir. Q. Knowing it and expecting that that is what he would try? A. I thought he might. I didn't know for sure. Q. Well, you were willing to take a chance? A. Yes. * * * I liked Ray as a friend. Q. Did you love him? A. Well, I am afraid I may have thought I did. Q. And the more time you spent with him, the more you loved him? A. Not exactly. I wrote that to Fern in a letter. That was only to make Kermit jealous. * * * I did not have sexual intercourse with Ray Vanderlinden and never have had with anyone else outside of Kermit Marker.''

Kermit testified that his meetings with Betty were usually with his sister Fern and were of a casual nature. He further testified:

''Q. Have you ever spent an evening in Betty Polito's home, you and she alone? A. No, sir. I never at any time made a date with Betty Polito to take her to a picture show. I never took Betty Polito to a dance and spent the evening with her. * * * I have never from the time I first knew Betty Polito up to the present time ever bought her a present [or] * * * spent an evening with her and her family and stay with Betty after the family retired. I have never spent an evening with her alone in her home. I never at any time up until last November ever told Betty Polito that I would marry her. Q. All right, did you ever at any time, Kermit, from the time that you met Betty Polito, ever consider her as your girl friend or your lover? A. I never did. I never wrote her a letter until I wrote her this one from Waterloo. I never asked her for a photograph of herself and never gave her one of my own. I admit that I had sexual intercourse with Betty Polito once and that was sometime in February, 1944. * * * I drove direct home and stopped in the lane to their home. I had sexual intercourse with her there. That is the first and only time I ever had sexual intercourse with her. Prior to having sexual intercourse with her, I did not promise to marry her and nothing was said about marrying. I did not tell her how much I loved her. * * * I went out to Polito's

about the 5th of last month and talked with her folks about getting married to Betty. I was out there three times. The first time, I was out there Mr. Polito offered me an interest in the farm if I would marry her. On that night I didn't say whether or not I would marry her. I had the baby in my arms that night. Q. It has been testified here by either Betty or her mother, or probably both of them, that you made the statement as you took the baby, 'Come to Daddy.' A. I did not. Q. Is that your baby? A. No, it isn't. Q. Do you know that isn't your baby? A. I do. * * * At a later time when I was out there, I did not tell Betty Polito for sure that I would marry her. Q. Why didn't you marry her? A. Because that baby is not mine.''

II. There was other evidence on both sides, of course. The able trial court expressed doubt as to the sufficiency of the evidence to sustain a conviction, but concluded as follows:

''If this prosecuting witness were some older than what she is, there isn't any question in the Court's mind but what the crime wasn't committed but in view of her age and the circumstances, I think that perhaps I ought to submit this case to the jury.''

We are disposed to agree that, had Betty been older than she was, the evidence would have been insufficient to sustain a verdict of guilty of seduction, but the verdict can be sustained because Betty was but fifteen years old at the times material herein.

Counsel for Kermit contend that: ''Although Betty was only fifteen years of age, by the calendar * * * she was much older than this in experience, particularly in reference to association with boys and their desire to have sexual intercourse and apparently she enjoyed her experiences and adventures along these lines.'' Counsel emphasize her associations with Ray Vanderlinden; that the allegation as to the date of seduction was twice changed; that Kermit was going with Margery Goebel at the very time that Betty claims to have been wooed and won; that Betty was shown the diamond ring that Kermit gave to Margery at a time that Betty claimed to be engaged to Kermit and to be having frequent sexual

intercourse with him in reliance upon her engagement to him; that other boys kissed her during this period and, in her letters to Kermit's sister Fern, Betty recounted exciting affairs with many boys. Betty testified that the notes to Fern were not true and were written to make Kermit jealous. Betty's whole course of conduct has a touch of the fantastic and can only be explained by the fact that she was a mere child of fifteen.

The attorney general contends: "That she [Betty] was young and girlish is demonstrated by the very language she used in her letters to Kermit's sister. * * * Clearly, while the very seductive arts employed by Kermit on her in this case, would not constitute the basis for a seductive charge, if employed on a girl of mature development they must be so construed, when employed on a girl of Betty's type and makeup. Actually if a mature girl had been the object of Kermit's attentions, we feel certain that his purpose, that is, submission to sexual intercourse, would not have been accomplished." We are disposed to agree with the attorney general and the trial court. Our decisions support their positions herein.

It is true that the evidence of Kermit's love-making is not impressive and the most persuasive device which he is said to have used was his assurance that, if anything happened, they would be married. In the case of State v. Haven, 43 Iowa 181, 182, we stated:

"It is perfectly natural and to be expected that the prosecutrix should as far as possible shield herself and cast the blame, if any there was, on the defendant. There should not therefore be any strained construction put on her language in order to sustain the verdict. On the contrary, as the defendant is entitled to the benefit of all reasonable doubts there may be as to his guilt, the language of the witness should receive no other construction than its fair and natural meaning may entitle it to."

In State v. Carson, 185 Iowa 568, 170 N. W. 781, the facts are stated as follows:

"For the sake of prosecutrix, as well as because it would serve no useful purpose to do otherwise, we refrain from de-

tail. Prosecutrix was but 17 at the time of her alleged seduction, and defendant, about 20. But the record shows conclusively that, beginning at 15, she had such relations with men as that, while it may be true that such relations were not criminal, they were such as made her sufficiently familiar with the 'way of a man' to understand the peril of permitting the defendant to take improper liberties with her * * * As to a promise of marriage, her testimony was this:

" 'He said if he got me into trouble, he would marry me—if he could not get rid of it, he would marry me. Q. Now, you would never have had intercourse with him unless he had either promised to marry you. A. No, sir.' "

In reversing the conviction in that case, we stated at pages 571 and 572 of 185 Iowa, at page 782 of 170 N. W., as follows:

"Using all due care and caution in dealing with this conviction, we are driven to hold that this verdict is against the clear weight of the evidence. Is a conviction for seduction sustained by evidence of such 'seductive arts' as were here employed? If so, a seduction would occur if a stranger met a woman in the road, introduced himself by stating that he loved her, and, proceeding to take indecent liberties, then and thereby induced the woman 'to lose control,' and overcame the objection that intercourse solicited under these conditions might get her into trouble by stating that, if that happened, he would either get rid of the child or marry. If that constitutes seductive arts and seduction, then, if the inmate of a brothel demands of a patron that, as a condition precedent to obtaining intercourse, he shall write a declaration that he loves her, and, if she conceives by him, he will either procure an abortion or marry, stages seductive arts and a seduction. We are of opinion the verdict is not warranted by the evidence. In reaching this conclusion, we are quite controlled by the elective and alternative nature of the promise testified to by prosecutrix, and the circumstances under which it was made."

In the case of State v. Valvoda, 170 Iowa 102, 110, 152 N. W. 21, 23, in reversing a conviction for seduction, this court states:

"The statute denouncing a penalty for seduction is for the protection of the pure in mind and innocent of heart, and may not be perverted to the punishment of persons induced to indulge in fornication by manifestations of desire and cravings for the satisfaction of passions on the part of the female, which preclude any inference either of existing chastity or that promises or seductive arts were necessary in order to overcome any scruples against the gratification of the animal propensities. The defendant responded in kind and merely kept pace with the prosecutrix. * * * She only claims a promise of marriage on condition that she would have intercourse with him, and the correspondence tends strongly to show that this must have been a matter of barter, an offer of wedlock in futuro for the sexual favors in praesenti. See State v. Price, 157 Iowa 412."

The language referred to in State v. Price, 157 Iowa 412, 416, 138 N. W. 520, 521, was as follows:

"Where the matter is one merely of barter, as in People v. Smith, 132 Mich. 58 (92 N. W. 776), there is reason for saying this does not amount to seduction. It is then but a blunt offer of wedlock in futuro in exchange for sexual favors in praesenti. State v. Reeves, 97 Mo. 668 (10 S. W. 841, 10 Am. St. Rep. 349)."

But the foregoing language is dictum because it is immediately followed by this statement:

"But it ought not to be said that a young girl of sixteen years, in yielding to one professing to love her, and in the circumstances described by prosecutrix, on the strength of such a promise, is necessarily of previous unchastity, or submitted as the result of passion, rather than the false promise of the accused. State v. Hughes, 106 Iowa, 125; State v. Knutson, 91 Iowa, 549; State v. O'Hare, 36 Wash. 516 (79 Pac. 39, 68 L. R. A. 107, 104 Am. St. Rep. 970). We adhere to the rule announced in the Hughes case."

In the case of State v. Hughes, 106 Iowa 125, 127, 129, 76 N. W. 520, 68 Am. St. Rep. 288, we stated:

"The evidence tends to show that the prosecutrix submitted to the embraces of the defendant, if at all, by reason of his promises that he would not get her in a family way, and that, if he did, he would marry her. While the statement, if made, was not direct, it was meant to be so understood by her, and she so accepted it. His assurances that no harm would be done evidently related to physical injury, and were not representations as to the character of the act. But it cannot be said that she relied upon these promises entirely freed from the flattery and arts he had been previously and was then practicing. * * * it cannot be said as a matter of law that an unsophisticated country girl of seventeen years, when addressed by a young man of five or six years her senior, with possibly a greater knowledge of the world, as in this case, and under the circumstances disclosed, would necessarily be of previous unchastity in yielding on the strength of such a promise, or that she submitted as a result of passion, rather than the false promises of the defendant."

In the Price case the circumstances, which were similar to those in the Hughes case, are stated thus, at pages 414 and 415 of 157 Iowa, at page 521 of 138 N. W., to wit:

"The mere fact that the promise to marry her if anything happened was the final argument which persuaded prosecutrix to yield did not eliminate from consideration the other influences which may have operated to overcome her scruples. Indeed, it is scarcely conceivable that a chaste woman could be induced to step aside from the path of virtue in the absence of all blandishments of love; and, even though a false promise may be essential to overcome her inclinations to virtue's side, other influences, such as protestations of love and artifices, such as assurances that there would be no harm because of an engagement, may have been quite as potential in accomplishing the seduction. * * *

"Our conclusion is that, notwithstanding the testimony of prosecutrix that the conditional promise of marriage was what finally induced her to yield to sexual indulgence, the court did not err in submitting to the jury whether seduction was

accomplished by protestations of love, deception, or other artifices.''

In State v. Weaver, 198 Iowa 1048, 1052, 200 N. W. 705, 707, the girl was sixteen, and we stated:

''A promise to marry the prosecutrix, conditioned upon her becoming pregnant, in connection with the use of flattery and protestations of affection, may constitute seduction. State v. Epps, 198 Iowa 580; State v. Price, 157 Iowa 412; State v. Hughes, supra.

''Here, the testimony of the prosecutrix is to the effect that appellant had frequently declared his affection for her, flattered her, and caressed her, and that he had repeatedly solicited her to have intercourse with him, and on the occasion when she consented, said it wasn't any harm; that she need not be afraid; that he knew how to keep from having children, and would stand by her if he got her into trouble. That these promises were false, subsequent events established. State v. Hemm, supra. * * * In connection with her testimony as to his previous solicitation and her promise to think it over, as shown by the entry in her diary, read into the record by counsel for appellant, we think this, so far from being conclusive that she did not yield because of his use of seductive artifices, tends rather to show that they had been effectual to accomplish his purpose, and that she yielded her virtue because of his previous persistent and artful persuasion and flattery, rather than because of her own passion. It is well settled that the jury was not confined, in the consideration of the case, to the circumstances immediately surrounding the act of intercourse, nor to the promises then made. State v. Price, supra. State v. Hughes, supra; State v. Rolling, supra.

''Nor do we think that his claimed relations with the Williams girl, or the knowledge of the prosecutrix that he was also attentive to her, require us, under the circumstances shown in the record, to say that the crime of seduction was not committed. State v. Hughes, supra.

''There are contradictions in the testimony of the prosecutrix, and her conduct in associating with other young men

after her claimed seduction is, to an extent, inconsistent with her story; but, upon the whole record, we are satisfied that the case was properly submitted to the jury, and that the evidence is sufficient upon this point to sustain the verdict."

Appellant contends that the evidence herein supports nothing more than a *blunt* offer of marriage in the future, on condition of possible pregnancy, in exchange for sexual favors in praesenti. The State contends that, even if the offer of marriage be considered to be conditional upon possible pregnancy, nonetheless it was given *in connection with* the use of flattery and protestations of affection and, accordingly, the jury was warranted in finding that appellant was guilty of seduction. We agree with the contentions of the State. Betty testified to protestations of flattery and affection, in addition to Kermit's promise to marry her if anything happened. We hold that, in view of the fact that she was but fifteen years of age, a jury question was presented on the issue of the sufficiency of her testimony that she was seduced by Kermit.

III. This brings us to the question whether Betty's testimony was sufficiently corroborated to meet the requirements of section 13900, Code, 1939. This statute requires that Betty's testimony be corroborated "by other evidence tending to connect the defendant with the commission of the offense." It must be borne in mind that Kermit is not charged with statutory rape under section 12966, Code, 1939, but with seduction, so that the corroboration must connect Kermit with the offense of seduction in violation of section 12970, Code, 1939.

As usually occurs in cases of this kind, the evidence relied upon is circumstantial. In reversing a conviction for seduction, we stated, in State v. Moss, 202 Iowa 164, 167, 209 N. W. 276, 278, as follows:

"It is well established that evidence of mere acquaintanceship, opportunity, or birth of a child does not, singly or collectively, meet the statutory requirement on corroboration; and for a stronger reason, the facts testified to by the prosecutrix cannot be considered as corroboration. State v.

Lenihan, 88 Iowa 670; State v. Enke,. 85 Iowa 35; State v. Carter, 196 Iowa 738.''

Corroborative evidence, in cases of this kind, must be such as to tend to connect the defendant with the practice of seductive arts upon prosecutrix. The evidence relied upon by the State in this regard includes the following: Betty's father testified 'that he met Kermit and Betty down by the gate to his farm and he told her, ''About time you came home.'' He was not certain as to the date, thought it was in 1942. Betty's mother testified that, when Kermit was out to their home in November 1944, Kermit took the baby and said, ''Come to Daddy Carolyn,'' and he arranged to marry Betty. The town marshal of Knoxville testified that he saw Betty and Kermit alone together in Knoxville late at night several times during the spring and summer of 1943; he saw her with Kermit about once a week, mostly on Saturday night, and Kermit's sister, Fern, was not always with them. Various witnesses testified that Kermit admitted at the preliminary hearing that he had had sexual intercourse with Betty without fixing the time. This varies from his testimony at the trial, where he was very definite as to the time. Kermit's letter from Waterloo, above quoted, expresses more affection toward Betty and Carolyn than he testified to as a witness. Also this letter corroborates the State's testimony that the arrangements in November 1944 for a marriage were more definite than Kermit was willing to admit as a witness. The case is a close one on the issue of corroboration, as it is on the question of seduction, but we think that a jury question was presented on each issue. As bearing thereon, see State v. Curran, 51 Iowa 112, 119, 49 N. W. 1006; State v. Lauderbeck, 96 Iowa 258, 259, 65 N. W. 158; State v. Davis, 193 Iowa 651, 652, 187 N. W. 692, and cases cited therein.

IV. The other assignments of error relate to rulings on evidence. One of them is based upon the following record:

''What was the reason that you submitted to him to satisfy his sexual desires? Mr. Stuart: Object to that as incompetent, irrelevant and immaterial, invading the province of the jury. The Court: Overruled. A. Well, as I understood

if, we loved each other. Kermit told me he loved me. Mr. Stuart: I move to strike the first part of the answer, 'As I understood it we loved each other,' as being purely an opinion and conclusion of the witness. The Court: Overruled.''

The rulings of the court were proper. In State v. Bennett, 137 Iowa 427, 429, 110 N. W. 150, 151, we stated:

''Prosecutrix was allowed to testify, over objection, that she yielded her person to the defendant's embraces because of his promises. While the authorities seem to be in conflict on this question, the ruling is in line with the previous decisions of this court State v. Hughes, 106 Iowa, 125; Hasbrouck v. Western U. T. Co., 107 Iowa, 160; Kruse v. Seiffert, 108 Iowa, 352; and has the support of Ferguson v. State, 71 Miss. 805 (15 South. 66, 42 Am. St. Rep. 492); State v. Brinkhaus, 34 Minn. 285 (25 N. W. 649); Wigmore, Evidence, section 581; Armstrong v. People, 70 N. Y. 38. Such testimony is of the condition of the mind, not a mere conclusion, and when this is in issue a person having knowledge of such condition ought not to be forbidden to speak.''

V. Another assignment of error complains of the court's limitation upon the purpose for which certain testimony was admitted, the court stating to the jury as follows:

''Members of the jury, I am going to permit testimony of this type, in other words, the actions and conduct of the prosecutrix with other persons than the defendant, Kermit Marker, after the date of the alleged seduction, for two purposes and two purposes only, one purpose being on the question of whether or not the prosecutrix was engaged to the defendant prior to and after the alleged seduction, and on the other question of whether or not the defendant is the father of her child. This testimony shall not be considered by you of any acts occurring after the alleged seduction as bearing on any question of her chastity prior to the alleged seduction. For those two reasons only this testimony is going to be admitted.''

We think that the position of the court was correct. In State v. Abegglan, 103 Iowa 50, 52, 72 N. W. 305, we stated:

"There was nothing in that which defendant proposed to show in regard to what occurred between Castner and the prosecutrix after the seduction is alleged to have been accomplished which could tend to explain what took place before. If the prosecutrix accepted the attentions of another suitor after that time, the fact would not tend to show that the defendant was not her suitor before * * * If she was guilty of improper conduct after that time, that fact would not tend to show him to be innocent of the offense charged, for it might be one of the results of the ruin he had wrought."

█ VI. The final assignment of error relates to the court's refusal to permit appellant to show that he was urged by Ernest Cowman to marry Betty and not take a chance on suffering imprisonment in the event of conviction, the purpose being to show that what Cowman told Kermit led to the arrangement for the marriage in November 1944, so that what Kermit then did was not voluntary. Counsel contend that Cowman was selected by Betty as her "ambassador" or agent to induce Kermit to marry her and that, because of this relation between Betty and Cowman, the evidence was competent. We will not prolong this opinion to review the evidence herein. We have carefully examined it and are unable to find therein a foundation for the introduction of such evidence.

The cause is—Affirmed.

All JUSTICES concur.